*HARRIS, YUG & OHLINGER*
ROBERTA OHLINGER-JOHNSON, ESQ.
Nevada Bar #10946
1489 W. Warm Springs Road, Ste #110
Henderson, NV 89014
702.966.8270 Telephone
866.592.8806 Facsimile
efile@HYandOAttorneys.com
Attorneys for Plaintiff(s)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA – LAS VEGAS

DAVID CHERRY and ALEXANDRIA CHERRY,  individually and as next friends and parents of JACOB CHERRY, A Minor

Plaintiffs,

vs.

CLARK COUNTY SCHOOL DISTRICT, SUSAN M. SMITH, individually and in her official capacity as Principal of Twitchell Elementary School, and SANDRA A. PIILO, individually and in her official capacity as Special Education Teacher,  DOES I-X,
Defendant(s)

CASE NO:  2:11-CV-01783-JCM-GWF

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' COUNTERMOTION FOR SUMMARY JUDGMENT (#63)

Oral Argument Requested

COMES NOW, DAVID CHERRY, ALEXANDRIA CHERRY, and JACOB CHERRY, by and through Counsel Roberta Ohlinger-Johnson of the law firm HARRIS, YUG & OHLINGER and hereby submits their Response in Opposition to Defendants' Countermotion for Summary Judgment (#63) timely pursuant to the Stipulation and Order of December 3, 2012 (# 61).

This Reply is based upon the Memorandum of Points and Authorities attached hereto, all papers and pleadings on file herein, and arguments of Counsel to be made at the time of any hearing.  Because this motion is a Countermotion and to prevent unnecessary duplicative filing of extensive Exhibits, Plaintiffs incorporate and reference their Exhibits 1- 62 as filed in their original Countermotion and Opposition, Docket #49 and #63.   Exhibit 63 is attached hereto.

Respectfully submitted this 28th day of December, 2012
By:*/s/ R. Ohlinger*
Roberta Ohlinger-Johnson, Esq.
HARRIS, YUG & OHLINGER
*Attorney for Plaintiffs*

PLAINTIFFS' RESPONSE IN OPPOSITION

TO PLAINTIFFS' COUNTERMOTION FOR SUMMARY JUDGMENT

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION & OVERVIEW

The Defendants move for summary judgment on two apparent concepts: 1. The argument that delivery of related services is sufficient, and that Plaintiffs should be remanded to Due Process on their Constitutional claims, and 2. The argument that Plaintiffs have failed to prove their case.   The motion must fail, because even should the Court determine that "Plaintiffs have not proven their case" pursuant to Rule 56, summary judgment is not warranted in Defendants favor, as the ample and extensive evidence produced in Plaintiffs' Countermotion for Summary Judgment, Docket 56, demonstrates. This is not a trial by affidavits: the Claims proceed to trial.

## II. REBUTTAL STATEMENTS OF THE FACTS

Pursuant to FRCP 56(c), Defendants may properly object that a fact <u>cannot be presented in a form that would be admissible in evidence</u>.   FRCP 56(c)(2), "*Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.*"  Each and every fact presented is authenticated through the record or reflects the record as maintained and presented by the Defendants.   All records presented to the Court may properly be considered pursuant to FRCP 56(c), as Defendants have failed to adequately allege a basis for their exclusion and indeed, have failed to identify which facts and documents are challenged.  Defendants go so far as to ask this court to ignore the best evidence – the documentary record - and to consider contrived narrative and self-serving testimony which contradicts their statements in the record and each other, as detailed below.

REBUTTAL TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

The Defendants assert simultaneously the following problematic positions: That ALEXANDRIA CHERRY's Journal and Responses to Interrogatories under oath are unreliable and yet the self-serving testimony of the Defendants, which directly contradicts the record of events and each other, is reliable.  It is a principle of evidence that a party statement – whether oral or written or machine generated - is not hearsay.  FRE 801, *1st Fin. SD, LLC v. Lewis 4* (D. Nev., 2012).  They may challenge the evidence such as to show alteration, but it is not in and of itself inadmissible.

1. Undisputed to the extent JACOB CHERRY received an abnormally high number of IEP revisions during the two years in dispute.  The legal significance is disputed.

2. The members of JACOB's IEP team are set by law.  20 USC 1414(d)(1)(B), 34 CFR 300.321.  The sufficiency of the IEP was addressed in administrative proceedings, resulting in Defendant CCSD's determination there was a loss of FAPE and an extremely large award of compensatory education in the amount of 180 hours.  See Ex. 50. Also see Ex. 46, SMITH's notes at CCSD 002477: "**Mr. Harley feels this was the least we could do w/ violations and teacher not providing FAPE/ teacher not working w/child.**"

3. A Behavioral Intervention Plan (BIP) is required by law and its mere existence is not legally significant.  20 USC 1414 (d)(3)(B)(1).  Instead, the BIP introduced into evidence states that the first antecedent to JACOB's behaviors was "use of cafeteria microphone."  No effort was ever made to reduce use of the cafeteria microphone, even though Ms. May testified she complained and that the cafeteria was "nerve racking" for a grown woman, including "somebody screaming on the microphone."  See' Ex. 3 42:2, 43:19, including intervening discussion, also Depo SMITH, Ex. 53 104:23-105:4, describing a lunchroom elopement by JACOB: "...his heart was pounding so hard...I thought it was directly the microphone."  Furthermore, the BIP provides that the second function of his behaviors was "Frustration-communication."  Ex. D. at 307.

4.  Ms. D'Lene May is not a Defendant in this lawsuit.  Ms. PIILO's experience is probative of scienter, as her actions were not those of a new teacher.

5. "Highly dedicated" is conclusory and is improperly asserted character evidence to prove action in conformity therewith.  FRE 404.  See Depo SMITH, discussing Ex. 46, stating: "teacher [PIILO] was observed to hardly ever work with student"… "LIDT thought teacher was sabotaging the situation so he would move, told aides not to work with.  Heard teacher tell other parents "don't worry I won't let HIM hurt your little girl.""  PIILO further stated that it was Ms. May, ALEXANDRIA, and Rosalind Spellman who worked with JACOB during lunch.  See Ex. 36.

6. This fact is irrelevant as to the allegations in this lawsuit.

7. The self-serving testimony directly contradicts PIILO's statements and conduct that she couldn't use PECs until she was trained in December 2010. Ex. 9, Journal Entry of Nov. 5 2010 IEP.  The deposition and records of Rosalind Spellman shows that in the Spring of 2011, PIILO did not implement any PECS with JACOB, which was witnessed by Russell Holmen of CCSD. Ex 43, 44.  Furthermore, Ms. May testified that she began working with JACOB at lunch because he no one was opening his lunch for him, and he was going home hungry with his lunch uneaten. Ex. 3 Depo May 37:4  39:22.   PIILO further testified against CCSD, that JACOB came to her classroom unable to use PECs. Ex. 36.

8. As a simple matter of record, no Notice of Injury has ever been filed for JACOB or any of his classmates. Ex. 7.

9. PIILO specifically testified that the room was too small and that would increase the chance of injury.  See Defendants' Ex. E, PIILO Dep, at 82:4 – 82:22.   Furthermore, the only persons ever injured in caring for JACOB were untrained in performing restraints, also called CPI.  All witnesses agree throughout the record: CPI training never occurred, although SMITH testifies PIILO was supposed to set it up.  See Ex. 17, Training Records, also Depo SMITH Ex. 53 22:1 -23:1.

10. The only individuals who were ever injured were untrained in performing restraints. Ex. 7, Ex. 17.  No training in restraints was ever performed.  Ex. 53 22:1 -23:1

11. Both SMITH and PIILO specifically testified that an "evacuation" is not an irregular occurrence for many reasons.  PIILO was asked: "Q. Did you ever have to remove the

classroom, the rest of the class for their safety? A. Yes.  Q. Was that due to the size of the room? A. Yes, and whatever – it was the size of the room and we don't want [ramble]…well, for multiple reasons we don't want the children in there..."  Ex. E, Depo. Piilo, at 82:25-83:24, Smith testified evacuation could be for a reason as simple as "saving face" for the student or for a student throwing chairs or desks.  Ex. 53 35:20, 37:5.

12.  This characterization is directly contradicted in Defendants' Statement of Facts 14, "In fact both testified they believed that Jacob would not try to intentionally hurt anyone and if he hurt someone it was always accidental."

13. The statement is not exculpatory, it is probative of the learning environment and reputational harm created by the Defendants.

14.  Admits civil malice.  These statements were stated in conjunction with a Request for Special Schools and Parental Prior Notices of change in placement.  Ex. 33. Furthermore, the statement that JACOB broke an aide's fingers is patently false: Kayla Vucekovitch broke them in a domestic violence dispute in October 2010.  See Ex. 51 at 12:12-18.

15.  According to CCSD, FAST and LIDT contradict the above justifications of SMITH and PIILO, instead stating they were able to work with JACOB, stating "he had behaviors but they were manageable."  Also describing the teacher at Bartlett as "inept" and describing PIILO as a saboteur in the classroom.

16.  The FAST team is not sued in this lawsuit.

17.  The number of meetings CCSD convened is only probative of the fact that they convened a lot of meetings.  It does not mean they were productive or appropriate.

18. In other words, when the IEP was convened it failed to include mandatory members of the IEP team under law, and that PIILO fraudulently filed an IEP at the insistence of district personnel. Ex. 21, 22, 23, also Ex. 59 at ¶ 5.

19.  Consent to a "seating arrangement to limit elopement" cannot be construed as informed consent to seclusion in the classroom and failure to instruct by the classroom teacher.

20. On December 15, ALEXANDRIA CHERRY consented to a re-evaluation based upon a rationale of "multiple impairments" which legal significance was not explained to her.

1  She revoked it upon reviewing JACOB's records and realizing he had just had his three year re-

2  evaluation. Ex. 25.

3      21. Dr. Scott's comments are not Defendants SMITH's.  They do mean inappropriate

4  institutionalization when they are made in conjunction with two (2) Parental Prior Notice of

5  District Proposal indicating a change of placement is imminent.  Plaintiffs' Ex. 33. According

6  to Chapter 3.0 of CCSD's Special Education Procedures Manual, 3.3.1. (a) **Change in**

7  **Placement**, "If the IEP team is considering a change in placement, such as moving to a more

8  (or less) restrictive setting…prior written notice to the parent is required."    Plaintiffs' Ex. 60,

9  attached hereto.  This testimony also contradicts the unusual planning for higher level district

10  personnel to be present at the IEP meeting of January 14, 2011. See Plaintiffs' Ex. 33 at Cherry

11  792.

12      22.  PIILO's testimony contradicts the two Parental Prior Notice of District Proposal

13  that PIILO signed and sent at the time, the request for Special Schools, and the gossip

14  promulgated by Kayla.  Plaintiffs' Ex. 33, 47.  PIILO testified against SMITH and Nanda

15  Rowe, stating "I think it was more Nanda.  Because Nanda was the one that came in and said

16  that Jacob wasn't placed appropriately.  And then I think after Nanda said that he wasn't placed

17  appropriately Susan said he was placed appropriately." Ex. 5 187:11.  She also testified to "is it

18  your testimony that he [JACOB CHERRY] was appropriately placed with the proper supports?"

19  to which she replied "Absolutely." Ex. 5 191:1.

20      23.  CCSD presents inadmissible hearsay of the recommendations by Dr. Leaf.  No

21  statements, affidavits, or reports by Dr. Leaf are in evidence or were produced in discovery.

22  Contradicts SMITHS's notes at Ex. 46, CCSD002477, which states "Ron Leaf would testify

23  against us went to court."

24      24. The cited testimony contradicts the statements of co-party CCSD as reported by

25  SMITH and also by R. Spellman, the aide, who reports she was told she and JACOB could not

26  come out of the area and the teacher never worked with JACOB.  Ex. 46, CCSD002475, Ex. 43,

27  58 4 – 58:7.

28

25. According to the Notices of Prior Action, the IEP was to change placement. Ex. 33. No one to date has proposed that CCSD, PIILO and SMITH were going to propose a less restrictive environment. The documents are party statements as they are signed by Alexandria CHERRY and PIILO, and comply with Rule 56.

26.     Inadmissible as PIILO did not have personal knowledge of what or how Compliance and Monitoring communicated with the CHERRYs.

27. Undisputed.

28. The allegation contradicts that the records including the trial data and observations and findings by CCSD that PIILO did not personally work with JACOB at any time in the Spring of 2011.  Ex. 43, Depo. Rosalind Spellman with attached Exhibit 1 and supporting testimony at 18 – 24, also for testimony that she was not instructed, not given materials, and not allowed out of the 4x6 area.  Ex. 43, 54:17 – 57:20.

29. The officers of CCSD represented that a loss of FAPE occurred and awarded compensatory education.  Ex. 50.  Also see Ex. 46, SMITH's notes at CCSD 002477: "Mr. Harley feels this was the least we could do w/ violations and teacher not providing FAPE/ teacher not working w/child."

30. The "rogue" aide was provided information she should not have had access to, and testified on the record that the information was provided to her by PIILO. Ex. 51 15:17 – 15:21.

Plaintiffs' Appendix I: the Defendants are incorrect in their evaluation of the records. Party statements are not hearsay pursuant to FRE 801, which includes CCSD.  They are admissible against them, regardless of form, to prove the truth of the matter asserted therein. Lack of authentication is not in and of itself fatal, as the proper objection in a Rule 56 motion is to object that the fact <u>cannot</u> be presented in admissible evidence, such as the purported statements by Dr. Ron Leaf, which are inadmissible hearsay of expert recommendations which cannot be presented in admissible format. Rule 56(c)(B).  Furthermore, should the Court consider these objections as to foundation of party statements to be a significant barrier to disposition and narrowing of the case on the merits, Plaintiffs request leave to correct.  Rule 56 (d).

1

### III. LEGAL ARGUMENT

2

### 1. "Overview of Federal Law"

3    The first argument is a re-litigation of extensively briefed issues in Defendants' Motion

4 to Dismiss, Docket 10 – 17, and their Renewed Motion to Dismiss, Docket 48, 55, and 65.

5 Despite the denial at hearing, the reargument of the same issue stands for the proposition that if

6 one keeps saying something is true, eventually it will be true.  As Plaintiffs briefed in their

7 Opposition to the Renewed Motion to Dismiss, even assuming *arguendo* Defendants were

8 correct, a dispositive adjudication on the merits is inappropriate, and dispositive relief is not

9 available.  Citing *Payne v. Peninsula Sch. Dist,* 653 F.3d 863, 881 (9th Cir. 2011).  The

10 Defendants replied with reliance on *D.C. v. Oakdale Joint United Sch. Dist.* (E.D. Cal 2011),

11 but Plaintiffs point to the subsequent procedural history of that case:  In 2011, the District Court

12 dismissed Plaintiffs' claims brought pursuant to § 504 of the Rehabilitation Act based upon the

13 *Payne v. Peninsula School District,* 653 F. 3d 863, 875 (9th Cir. 2011).  The *D.C.* Plaintiffs then

14 filed a Second Due Process Complaint, which was "dismissed in its entirety" by the Office of

15 Administrative Hearing for lack of jurisdiction over the 504 claim.  Plaintiffs refiled in District

16 Court.  Plaintiffs were finally allowed to proceed having thus exhausted two courts and four

17 cases without development of a record. In that case, it was in essence appealed down to the

18 administrative hearing officer to state:  The IDEA grants no jurisdiction over Constitutional

19 Harms.  *D.C. v. Oakdale Joint United Sch. Dist.* (E.D. Cal 2012).

20    Defendants seek to confuse the issues, as they argue that delivery of related services

21 negates the torts, including Plaintiffs' claims for relief under the Rehabilitation Act and ADA.

22 Related services under an IEP are required by law to assist a handicapped child to receive the

23 benefits of an education and instruction. 20 USC 1402(26), NAC § 388.01.  Provision of these

24 supports does not negate the denial of rights to a disabled child and his family.  Here, the

25 District determined, as a matter of record, that JACOB did not receive an education for two

26 years.  Ex. 50, 45, 46.  Ex. 46 is authenticated by SMITH depo Ex. 53 96:5, attached as Exhibit

27 3.  Ex. 46 is duplicative of Ex. 45, which may be authenticated by Michael Harley, who has

28 affirmatively testified as to other documents. Additionally, the Court may consider the direct

testimony of SMITH that she was presented Ex. 46 by Michael Harley, during a "disciplinary conference" including her notes, authenticated at Ex. 53 103:6.  For example, SMITH directly told her that Michael Harley told her "the LID team was reporting that the aides were told not to work with him." 53 103: 20.  Also: "Michael Harley told you they were deliberately isolating him [JACOB CHERRY] in the classroom? A: He said that that's what the LID team was saying..." 53 118:8.  "I can't – I don't know this, but I can't imagine Sandra saying, don't worry, I won't let him hurt your little girl...Q: You simply don't believe it? A. I don't." 53 114:20.  Remember, this is the same Michael Harley testifying at Ex. U, R, and S who is a licensed attorney in Illinois and CCSD's Compliance Officer.

Viewing the record in the light most favorable to the non-moving parties, the testimony of SMITH shows her as a grossly incompetent administrator who reacted to parent complaints, no matter how poorly motivated, or misinformed.  Ex. 53 depo SMITH at 74:8.  She admits that she denied the disabled boys in the KIDS class, including JACOB CHERRY, use of the boys' restroom and toilet training due to parent complaints. Ex. 53 at 125:8 – 126:12.  She admits she believes a complaining parent was racist, so she implemented segregated seating in the KIDS classroom. Ex. 53 144:12.  She admits she purposefully defamed a six year old non-verbal boy supposedly to help him, thus admitting civil malice, because CCSD was non-responsive to her. 53 48:20.  She admits willful blindness in turning a blind eye to the damage to JACOB CHERRY: she didn't investigate the details of information that Kayla Vucekovitch disclosed regarding JACOB CHERRY, including where the breach came from - PIILO. Ex. 53 79:12. She admits that when Michael Harley from the Office of Compliance and Monitoring confronted her with the results of his investigation – she didn't investigate because she simply didn't believe it. Ex. 53 115:2, 107:1. 107:4, 102:8-103:22.

Gross misjudgment, civil malice, and willful blindness are her best <u>defenses</u> in this suit. No amount of factual contesting with Plaintiffs, including denying admissibility of their own statements – written or oral – warrants granting the Defendants judgment as a matter of law.

PIILO admitted to filing a fraudulent IEP but blamed Nanda Rowe, CCSD's special education representative on campus.  PIILO never denied the plan to have JACOB sent to a special school, but blamed SMITH and Nanda Rowe. Ex. 5 75:3 – 75:22.

CCSD has presented absolutely no defense to setting up a perfect storm through its indifferent administration of the entire crisis and then ignoring the problem with silence. See Depo SMITH Ex. 53 100:2 – 101:5, also 48:17. Higher CCSD officers who are in the record such as Dr. Cathy Scott and Dr. Eva White offer nothing in defense: Plaintiffs have not placed the sufficiency of the IEP in controversy.  The denial of FAPE was determined by an Officer of CCSD, Michael Harley, through their internal investigation.  Ex. 45, 46, and 50.

**2. Violations of the Constitutional Right to Due Process: Conspiracy (42 U.S.C. § 1985)**

Defendants give three reasons to deny Plaintiffs' Conspiracy, 1) lack of direct evidentiary testimony to a conspiracy, 2) lack of motivation by some racial or other class-based animus because 3) handicapped individuals are not a suspect class.  All must fail.

First, that there was a conspiracy in place to get JACOB moved to a different school is beyond dispute and is supported by an ample record.  On January 7 and January 10 Defendant PIILO sent Alexandria and David Cherry two separate "Parental Prior Notice of District Proposal" specifically marked "**Change in special education placement**."  Ex. 33.

The Special Education Program of the Clark County School District is governed by the Special Education Procedures Manual.  See Ex. 60 attached hereto.  Procedure 8.4.1 provides a Continuum of Placement Decisions.  This continuum ranges from regular education classes to institutions. Ex. 60 at 8.4.1.   JACOB was in special classes and a change in placement could only mean JACOB was to go to either regular education classes or a special school.  It is clear as a matter of law and record that the only logical goal of the Parental Prior Notice of District Proposals was to move JACOB to a special school.

In testimony PIILO indicated the existence of intent at least by SMITH to send JACOB to a special school.  When asked "So you heard Susan SMITH say he [JACOB CHERRY] wasn't placed appropriately and you disagreed with that?" PIILO Testified: "Well, Nanda had come in and said – if you look at the – an earlier e-mail, she had come in and said there is –

1   there's an appropriate place for him [JACOB].   You know, I came in and I observed and I

2   looked and **she said, Oh, yeah, we have within the district a placement for Jacob that's**

3   **more appropriate**." Ex. 5 110:7.   PIILO later confirmed: Q: Is it your testimony today that in

4   order to make an IEP-placement decision that you would need a case worker present? A.   We

5   need a lot of people present.   We would not be able to change a specific placement.   You can't

6   do that, no.   There would have to be a lot of people that would make that decision and it

7   wouldn't be at a school level." Ex.5 186:8 – 186:17.

8         Looking back at Exhibit 33, the Parental Prior Notice Meeting Arrangement of January

9   10, 2011, listed Area 3 SSSD Representative and Area 3 ECSE Mary Wiser, <u>District personnel</u>

10   <u>who had never been present at a prior IEP meeting.</u>   On January 11, 2011 Plaintiffs filed due

11   process, costing them $2500 in attorneys fees, which are damages in fact.   The filing of a due

12   process as a matter of law invokes the stay put provisions of the IDEA, so a change of

13   placement cannot be made, which is what Kayla referenced when she complained to Gail

14   Pubols about a suspected "inside leak." 20 USC §1415(j). see Ex. 47, Cherry 681, ¶ 2 stating "

15   When the lawsuit was presented and the and "stay-put" clause kept Jacob in the program, Kayla

16   was extremely upset and speculated to us that there must be an inside leak to the Cherry's and

17   told us she suspected Ms. May….".

18         Furthermore, the evidence cited by Defendants as Ex. N was a statement by Dr. Scott,

19   not SMITH or PIILO.   Remember, SMITH's response to this email was to tell Dr. Scott on

20   January 7, 2011 that "**I do not want to put this information in wiring [sic] over Interact, so**

21   **can you please call me sometime today when you have a moment to breathe?   We are**

22   **going to need either Michael Harris, you, or someone else that can assist with discussing**

23   **and making placement decisions at this IEP.   I have had very "informal" discussions with**

24   **all stakeholders involved with the education of J.C., and I need to share with you what I**

25   **believe our team will propose during this meeting.   Thanks!**" Ex. 27, Email of January 7,

26   2011 CCSD 000723.

27         This email indicating that she spoke with all the stakeholders is an explicit statement of

28   the meetings of the minds conspiracy.   Her desire not to place the information over Interact

1  demonstrates the mens rea by desiring secrecy.   That JACOB has never been placed in a

2  special school only serves to underscore that the proposed institutionalization was

3  inappropriate.  Damages were incurred in stopping the conspiracy.

4       Defendants' reliance on *Bonner v. Lewis*, 857 F.2d 559, 565 (9th Cir. 1988) for the

5  proposition that handicapped persons are not a suspect class for purposes of a § 1985 violation

6  is misplaced.  Doc 63, Page 19, Lines 16-25. *Bonner* was a pre-ADA case in which the court

7  concluded that deaf inmates could bring claim pursuant to § 504 of the Rehabilitation Act, the

8  pre-existing statute to the ADA. The Court did not consider §1985 at all.  Defendants' citation

9  to *Swisher v. Collins* is inappropriate as it is an unpublished opinion lacking precedential value.

10      Denial of the federal guarantee of the Least Restrictive Environment (LRE) under both

11  the Rehabilitation Act and the IDEA to a handicapped child is a deprivation of a citizenship

12  privilege.  Section 8.2 of CCSD's Special Education Manual also mandates LRE.  The IEP team

13  is a deliberative body convened pursuant to federal and state law and tasked with balancing the

14  right of children with disabilities to the LRE with any disruption to education of their non-

15  disabled peers. 40 USC 1412, 20 USC 1414, NAC 388.284, NAC 388.  When SMITH acted to

16  inappropriately influence a deliberative body in a secretive and covert fashion she engaged in a

17  conspiracy to violate JACOB's civil rights.  Considering the records and testimony by PIILO,

18  no reasonable jury could find that SMITH and PIILO were not planning to institutionalize

19  JACOB. The Defendants are not entitled to judgment as a matter of law.

20  **3. Reply to Defendants' Opposition to Summary Judgment for 42 USC §2000d Claim**

21      The first argument can be summarily dismissed as all parties agree that JACOB was the

22  only African American child in the KIDS class at Twitchell.  Additionally, his one-on-one aide,

23  Rosalind Spellman, was also African American.  Thus, he is a member of a suspect class and all

24  actions related to him are reviewed under the strict scrutiny standard. *Tucson Woman's Clinic v.*

25  *Eden*, 379 F.3d 531, 543 (9th Cir., 2004), *Grutter v. Bollinger*, 539 U.S. 306, 326, 123 S. Ct.

26  2325(2003).

27      Defendant SMITH directly testified that she believed a parent who complained about

28  JACOB CHERRY was racist, and that her seating arrangement for JACOB was intended to

keep JACOB separated from that parents' children.  At deposition she testified more to her fear the parent would call her, with no consideration for the rights of JACOB: "Q: Was he prejudiced in terms of color? A: Yes. Q: Was he prejudiced against – do you believe he was prejudiced against Jacob Cherry because of his color? A: I do.  Is this going to get back to him? I just know because he'll call me and I – I mean, I've already dealt with him once on it anyway." Ex. 53 144:10 -144:17.   The discussion of racial discrimination continues: **"…So what we did is –or Sandra did is she had Jacob on one side with some kids and the twins on the other side with some kids so that they wouldn't have the ability to interact, if that makes sense.  Q: So they were kept apart then?  A: Right.**  Like I said, he never said that, but it was just a- I don't know.  I just could feel it.  I don't know how to…" Ex. 53 148:6.

This is not a question of inferring that the seating arrangement in JACOB's class was racially motivated or any question of disparate impact.  SUSAN SMITH, the school principal and representative of CCSD, testifies that she and the classroom teacher PIILO intentionally seated JACOB to segregate him by race.  Their purported reliance on the recommendations of Dr. Ron Leaf to justify their isolation of JACOB within the classroom is pretextual hearsay, as no report or recommendation or statement by Dr. Leaf has been produced.  The Defendants are not entitled to judgment as a matter of law.

**4. Rehabilitation Act & the ADA**

The Defendants do not contest the following undisputed facts:

1. That boys in the KIDS class were not allowed use of the boys' restroom because parents complained.

2. The teacher, PIILO, refused to instruct, prepare materials or lesson plans.

3. That the District CCSD assigns children on the basis of location without respect to their individualized needs or the training and preparation of the classroom teacher.

4. That CCSD executed a purchase agreement with "BETWEEN THE CLARK COUNTY SCHOOL DISTRICT AND THE "DAVID CHERRY/ JACOB CHERRY" FAMILY FOR THE REIMBURSEMENT OF EXPENSES TOTALING NOT MORE THAN $12,000.00…" for ISS services, commonly called home services.  Ex. 16 at Cherry 736.

On November 17, 2012 a decision was handed down by the Nevada Department of Education (NV DOE) titled "COMPLAINT INVESTIGATION CLARK COUNTY SCHOOL DISTRICT (#CL062112)" and issuing an order for corrective action. Attached hereto as Ex. 61. The sixth charge alleged that "Parents were required to pay the upfront costs of ISS for their children." Plaintiffs' home services, their purchase order and invoices with backup submitted to CCSD is located at Ex. 16. In its findings NV DOE determined that "If IIS is required in order to provide a student a FAPE, the services must be provided at no cost to the parents and the timely implementation of the service is the responsibility, not the parent. (34 C.F.R. §§300.156 and 300.201)." *Id.* at 12. CCSD was ordered to take corrective action, including providing services at no cost to the parents. The CHERRYs experienced delay in their home program for almost a year, until June 2010, and then they were required to pay for it with reimbursement for out of pocket expenses, where other parents were not. See Ex. 63, Aff. Valerie Soto.

Defendants' contention that their intervention was timely is fundamentally flawed because the record demonstrates the Office of Compliance of Monitoring had notice of the situation from January 2011, and still did not send an observer to the classroom until April 2011, when Russell Holmen observed the conditions himself. Still <u>no action</u> was taken to prevent ongoing harm until May 2011. Ex. 44. SMITH testified she simply didn't believe it when Michael Harley, an attorney actively licensed in Illinois and the Compliance Officer for CCSD with full authority, presented her with the results of the investigation. This is indifference as a matter of law on the part of CCSD, and gross misjudgment by SMITH. The Defendants are not entitled to judgment as a matter of law.

**5. Section 1983 – Violations of Equal Protection**

Here, Plaintiffs move for simple recognition that regardless of differences in the content of an IEP, all IEPs are confidential, as are all medical records; and the parents of all the children with autism in the KIDS program were similarly situated. As a matter of law, to be eligible for instruction in a self-contained classroom for autism instruction a student must have an evaluation, an eligibility determination, and an IEP. Therefore they have a confidential folder,

1   and because an evaluation includes a medical review, the child must have a medical record.

2   That an *Individualized* Education Plan would be individualized is tautologically true.   It's

3   discriminatory on its fact for the Defendants to suggest that the greater the handicap, the less

4   application of confidentiality.   Depo SMITH, Ex. 53 83:9, stating "I just know that we don't

5   release information due to FERPA, F-E-R-P-A."

6          Rather than defend factually, the Defendants cite to *Bonner v. Lewis*, 857 F.2d 559, 565

7   (9th Cir. 1988) and *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S. Ct. 3249

8   (1985), these cases were decided prior to enactment of the ADA.   They also cite to *Purze v.*

9   *Village of Winthrop Harbor,* 286 F.3d452 (7th Cir. 2002) a case alleging denial of equal

10   protection for failure to approve preliminary plats of a subdivision plan, where real property is

11   always legally unique.   Their use of *Appel v. Spiridon,* 531 F.3d 138 (2nd Cir. 2008) is equally

12   unavailing: the *Appel* Court applied Supreme precedent that Equal Protection Clause class of

13   one theory does not apply to public employees. JACOB CHERRY is no more a public

14   employee than he is a subdivision plot. In their citation to *Neilson v. D'Anglis,* 409 F.3d 100

15   (2nd Cir.2005), Defendants conflate and misapply the theories.  As *Neilson* explained, "In such a

16   "class of one" case … the existence of persons in similar circumstances who received more

17   favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was

18   intentionally singled out for reasons that so lack any reasonable nexus with a legitimate

19   governmental policy that an improper purpose—whether personal or otherwise—is all but

20   certain." *Id.* at 105.  These are the very factors at work here.

21          The defense, that somehow JACOB's severity of disability denied him the benefits of

22   confidentiality is ridiculous on its face and would subject the actions of CCSD to strict scrutiny

23   on the basis of a suspect classification, an analysis the Defendants cannot survive.    *Tucson*

24   *Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir., 2004), *Grutter v. Bollinger*, 539 U.S. 306,

25   326, 123 S. Ct. 2325 (2003). Again, there is no admissible record, only hearsay, that Dr. Ron

26   Leaf ever made the recommendations that Defendants' rely upon in support of their contentions

27   that denial of an education or failure to provide JACOB with work materials or teacher

28   instruction was the result of expert advice, and the representation is pretextual.  Plaintiffs are

1    entitled to judgment as a matter of law. The Defendants are not entitled to judgment as a matter

2    of law.

3    **B. STATE LAW CAUSES OF ACTION**

4        1. DEFAMATION

5        All statements that JACOB broke the fingers of an aide are patently false.  Ms.

6    Vucekovitch – the only aide who ever had broken fingers - has testified she told SMITH at the

7    time that they were broken in a domestic violence dispute.  Ex. 51 12:12.  As to the statements

8    regarding PIILO running into the door, the relevant Notice of Injury states in all caps: …I RAN

9    INTO THE EDGE OF THE DOOR.  Ex. 7.  It was signed by Smith on November 16, 2010.

10   Ms. SMITH signed all Notices of Injury the day they were submitted.   Ms. SMITH was

11   therefore in possession and had actual knowledge of all then-existing records at the time she

12   made these statements.

13   It was SMITH's job as an administrator of CCSD to know whether or not her allegations

14   were true prior to making such potentially damaging statements.  Ex. 53 9:25 – 10:5, stating she

15   has final supervising authority her school.   This is reckless disregard for the truth as a matter of

16   law.  Remember, JACOB had only just turned six.  He lacked the strength to do such damage,

17   to which SMITH specifically spoke of his being "fast and strong" twice and "aggressive"

18   countless times.  The other factors supporting malice are motive and intent.   SMITH referenced

19   her desire to institutionalize JACOB in her email of January 5 in which she stated, "I truly feel

20   that he [JACOB CHERRY] needs a placement…with an area that is well-padded for when he

21   has a breakdown."   As an administrator, it was her job to recognize the need for additional

22   training in CPI for her staff, and her job to duly investigate the purported injuries in the

23   classroom.  The Defendants are not entitled to judgment as a matter of law.

24       ///

25

26       2. INVASION OF PRIVACY AND FALSE LIGHT

27   For the purposes of this motion, the following breaches of confidentiality were publicized in

28   false light:

- Kayla Vucekovitch (Kayla) disclosed details from JACOB's medical files from 2008 regarding a near drowning.  Ex. 51 depo Kayla 15:17. Kayla has testified that PIILO told her that information. Ex. 51 15:20.
- DAVID CHERRY took an early retirement from the New York City Police Department in 2004.  Ex. 47, authenticated by G. Pubols at subsequent deposition, attached hereto as Ex. 62, 41:4, also see 24:2.  This was the year JACOB was born and several years prior to JACOB's diagnosis with autism in 2007, and hardly presents any basis that they planned to sue the school from the beginning.
- Kayla Vucekovitch was not a member of JACOB's IEP team, while his IEP meetings are confidential as a matter of law.  Ex. 47, Ex. 42, Ex. 62.  According to SMITH, JACOB's confidential file was locked in the office, so they should have been unavailable to Kayla. Ex. 53, 66:1 and subsequent testimony, Ex. 62 14:21.
- As Defendants appear to deny that JACOB was pending removal at the Due Process hearing in January 2011, Kayla had neither cause nor clearance to be in possession of any information that would cause her to leap to an erroneous speculation. Ex. 47, Ex. 62 14:21., Ex. 53 54:23-65:11.
- Due Process operates at the District Level, their pleadings are confidential, and the hearings are closed unless parents request they be opened.   20 USC 1415(f)(2), 34 CFR 300.512(c)(2).  Kayla had neither cause nor clearance to have any information regarding the Due Process, including the operation of the 'stay put' clause that kept JACOB in the program.  Ex. 47, 62 18:21.

The Defendants argue Kayla was a 'rogue aide.' Kayla states she was told about confidentiality but never trained.  Ex. 51, 8:23.  The Defendants fail to grasp that inappropriate disclosures were made when they were made <u>to</u> Kayla Vucekovich (Kayla) not when Kayla disclosed that information to third parties.  Furthermore, the Defendants do not attempt to even articulate the legitimate educational interest that Kayla Vucekovitch had in this information, because she had <u>neither cause nor clearance</u> to be in possession of any confidential information

1  beyond what she observed in the classroom and needed to know to assist JACOB.  She lacked

2  any expertise and training to access sensitive information.

3         As a matter of fact, the disclosures were made to her during school in the course of her

4  employment, and were distributed to parents who she knew from the school.   Gail Pubols[1]

5  affirmatively testified that Kayla discussed JACOB CHERRY on school campus, on school

6  trips, during lunch, as well as outside school times, as reflected in her letter to SMITH on

7  September 1. Furthermore, her relationship with Kayla was limited to school related purposes,

8  ABA training with her child.  Rosalind Spellman, the aide who was assigned into the classroom

9  in the Spring 2011, also chided Kayla in the classroom for discussing JACOB with parents.  As

10  a matter of law her disclosures were then in the course of scope of her employment.

11         Considering the factors set forth in *People for Ethical Treatment of Animals v. Bobby*

12  *Berosini, Ltd.*, 867 P.2d 1121, 110 Nev. 78 (Nev., 1994) degree of intrusion, context, conduct

13  and circumstances, liability must attach.  *Id.* at 1130.  Even reading the evidence in the light

14  most favorable to the non-moving parties, the context of these disclosures is highly offensive:

15  JACOB was an intense student in the KIDS program, with parental complaints, a lawsuit by the

16  CHERRYs in the form of a Due Process proceeding, and continued violations including locking

17  the parent out of the classroom which is admitted by PIILO.  Discussion of the Cherry's should

18  have been more highly protected, not less. There is no reason on earth why an aide barely out of

19  high school who helps JACOB eat and go potty needs to know that information.  Her need to

20  know basis was grossly and tortiously exceeded.

21         As to the reasonable person standard of offensiveness, the disclosures violated the law,

22  even where the law does not provide a private right of action, such as under the Nevada

23  Administrative Code, HIPAA or FERPA.  Ms. Pubols stated in her letter to Ms. Smith  - which

24  Ms. Smith received at her email and replied to, that she and her husband "were uncomfortable

25  knowing such *intimate* details about another student" emphasis added, at Ex. 47.   SMITH

26  herself recognized the offensive nature of the disclosures when she advised Kayla she could be

27  subject to suit and further stated at deposition: "...they [the parents] even said to her [Kayla] are

28  _____
[1] The Deposition of Gail Pubols occurred subsequent to the filing of the moving papers and will be supplemented should the Court so request.

you supposed to be talking about this and – so then they came and spoke with me." Ex. 53, 72:6.  Furthermore, all witness testimony indicates that throughout the Spring of 2011 Kayla continued to have access to information and share it.  See Depo R. Spellman, 43 60:25 – 61:1. She was never even reassigned away from JACOB CHERRY and PIILO.

3. NEGLIGENT SUPERVISION CLAIM

Defendants assert discretionary immunity in defense to the claim of negligent supervision.  The threshold question is whether the decisions are discretionary, to which the answer is <u>no</u>.  They are affirmative, non-delegable duties which fail the *Berkovitz-Gaubert* test for discretionary immunity as applied in Nevada.  *Martinez v. Marisczczak*, 123 Nev. 443, 446, 168 P.3d 720, 728 (2007).  Here, CCSD has an affirmative duty to insure that children in its care are fed and hydrated, especially where the child is vulnerable as with special needs children, and has a known inability to care for himself as expressed in his IEP.  Indeed, one justification for placing JACOB in a self-contained program (his LRE) was his need for "self help" skills and communication.  Ex. B p.2, Ex. C p.2.

To that end, both CCSD and the State of Nevada participate in multiple programs such as free and reduced lunch, and CCSD employees are routinely albeit unfortunately subject to child abuse and neglect charges.  Judicial notice may be taken of the following publicly accessible sites:   http://www.ccsd.net/departments/food-service/national-school-lunch-program also the State of Nevada Department of Education annual reports http://www.doe.nv.gov/FRL_Reports.  Likewise, CCSD has an affirmative, non-delegable duty to insure confidentiality of records pursuant to NAC 388.289. The Defendants' position is fundamentally flawed as it presents compliance with law and policy decisions made far above their heads as optional in regards to "staff morale."

These facts also fail the second prong of the *Berkovitz-Gaubert* test as applied in *Martinez* where the Nevada Supreme Court held that while a physician's diagnostic and treatment choice involve judgment and choice, those decisions do not include policy considerations to meet the test's second prong.  Here, policy considerations regarding feeding children and confidentiality were made legislatively, and cannot be contradicted by

1    discretionary considerations of "staff relations, morale, resource allocation."  Docket 62, line

2    21.  "Resource allocation" is irrelevant if taken to mean in this context, as it must, differentially

3    assisting one child to eat and not another, or alternatively inappropriate disclosures.  Plaintiffs

4    are entitled to judgment as a matter of law.

5         4. SUMMARY JUDGMENT ON THE NIED CLAIM

6         Again, the Defendants attempt to confuse the issues by bringing up administrative due

7    process.  IDEA is not tort, and tort has never even purported to apply "technical educational

8    expertise" to any question of fact and law.  Simply put, the Defendants attempt to limit their

9    liability by limiting a disabled child and his parents' access to the Court in direct violation of

10   Congressional mandate.  Their cite to *Crippens v. Sav On Drug Stores*, 114 Nev. 760 (1998) is

11   not availing to them as the *Crippens* Court explicitly recognized that the language of

12   automobile accidents cannot be applied in other contexts, such as the facts where the daughter

13   slowly poisoned the mother on the basis of a pharmacist's negligence.  The Court held [t]he

14   overall circumstances must be examined to determine whether the harm was foreseeable.

15   Foreseeability is the cornerstone of this Court's test for Negligent Infliction of Emotional

16   Distress.  *Crippens* at 763, citations omitted.

17        *Starr v. Rabello*, 97 Nev. 124, 126, 625 P.2d 90, 92, (1981) is unquestionably old case

18   law, which nonetheless addressed intentional infliction of severe emotional distress as to

19   bystanders and permitted recovery.  The Court evaluated then-existing precedent and noted: "In

20   each case, the defendant had knowledge that the witness was either pregnant or had recently

21   given birth and was in a weakened state. Knowledge of a witness's condition tends to increase

22   the outrageous nature of the act."  *Id.* at 126.  Here, that the victim was a small, five to six year

23   old nonverbal autistic child, cannot be denied.  Nevada permits recovery to his parents for

24   witnessing the effects of two years of negligence and intentional torts despite their valiant and

25   continued efforts to stop it.

26        There was a lack of educational services for two years, as the parents desperately tried

27   home interventions, IEP meetings, volunteering in the school, a due process, and intervention

28   by the Office and Compliance and Monitoring – a slow moving educational trainwreck.

1   Leaving a child hungry, as the "aides" in this case did, is a battery.  Volunteering at school only

2   to find your child hungry and head banging is both a "technical" battery and shocking.  Trying

3   to get in the classroom, knowing your child is segregated and being subject to lockdown

4   procedures, is shocking.   It is entirely foreseeable that parents experiencing the impact of

5   defamation and hostility, even if only caused by an <u>irresponsible</u> (as opposed to intentional)

6   district, administrator, and teacher would suffer emotional distress.   It was their jobs to

7   supervise the aides, which was woefully lacking.

8                                              **CONCLUSION**

9   WHEREFORE, based on the foregoing record of tortious acts and omissions, Plaintiffs

10  respectfully request that the Court grant them Summary Judgment as to Liability and Deny

11  Defendant's Countermotion for Judgment.

12

13                               Dated this 28th day of December, 2012.
                                 By:*/s/ R. Ohlinger*
14                               HARRIS, YUG & OHLINGER
                                 ATTORNEYS FOR PLAINTIFFS
15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

This is to certify that on the 2nd day of January, 2013, I filed the foregoing RESPONSE IN OPPOSITION TO DEFENDANTS' COUNTERMOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel, and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Kara B. Hendricks
Mark Ferrario
GREENBERG TRAURIG, LLP
3373 Howard Hughes Parkway
   Suite #400 North
Las Vegas, NV  89169
*Counsel for Defendants*

Dated this 2nd day of January, 2013.

Dawn M. DeMastrie
Legal Assistant
HARRIS, YUG and OHLINGER