***WARM SPRINGS LAW GROUP***
***fka HARRIS, YUG & OHLINGER***
ROBERTA OHLINGER-JOHNSON, ESQ.
Nevada Bar #10946
1489 W. Warm Springs Road, Ste. #110
Henderson, NV 89014
702.966.8270 Telephone
866.592.8806 Facsimile
efile@warmspringslaw.com
Attorneys for Plaintiff(s)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA – LAS VEGAS

DAVID CHERRY and ALEXANDRIA )
CHERRY,  individually and as next friends and )
parents of JACOB CHERRY, A Minor )

     Plaintiffs, )

  vs. )

CLARK COUNTY SCHOOL DISTRICT, )
SUSAN M. SMITH, individually and in her )
official capacity as Principal of Twitchell )
Elementary School, and SANDRA A. PIILO, )
individually and in her official capacity as )
Special Education Teacher,  DOES I-X, )
     Defendant(s) )

CASE NO:  2:11-CV-01783-JCM-GWF

RESPONSE IN OPPOSITION TO

RENEWED MOTION FOR SUMMARY

JUDGMENT (#95)

*"Don't worry, I won't let **him** hurt your little girl."*

-   ***S. Piilo***[1]

   COMES NOW, David Cherry, Alexandria Cherry, and Jacob Cherry, by and through Counsel Roberta Ohlinger-Johnson of the law firm WARMS SPRINGS LAW GROUP, formerly known as HARRIS, YUG & OHLINGER and hereby submits their response in opposition to Defendant's Motion for Summary Judgment.

### I. INTRODUCTION

   Since 2007, Jacob Cherry attended the Clark County School District as an African-American, non-verbal autistic child. He is classified as a vulnerable person under state law.

---

[1] Per CCSD's Internal Investigation Ex. 28, auth. by Smith at Ex. 2  95:24 – 98:5.

NRS 41.1395.  Although the original complaint in this matter sought relief for several violations of Jacob's federal rights, this Court dismissed portions of Plaintiff's Complaint Causes on September 30, 2013 for failure to exhaust administrative remedies under the IDEA, 20 USC 1400 et.seq.[2]

The remaining claims in this lawsuit seek redress for violations of the Title VI of the Civil Rights Act of 1964 (42 USC 2000d) and state law torts of defamation, invasion of privacy/false light, negligent supervision and negligent infliction of emotion distress inflicted in the Clark County School District from 2009-2011.  Plaintiffs assert that their claims for violations of the equal protection clause[3] on the basis of racial discrimination were not subject to exhaustion and should have survived dismissal.

Viewing all evidence in favor of the nonmoving party, substantial evidence – both direct and circumstantial, create a genuine issue of material fact.   Although the CCSD Defendants blame a "rogue aide," a genuine issue of material fact exists as to whether the aide was inadequately trained and supervised, and allowed to run rogue under the direct supervision and instruction of Defendants CCSD, Principal Susan Smith and Teacher Sandra Piilo.

## II.  REBUTTAL STATEMENT OF UNDISPUTED FACTS

Plaintiffs dispute the authenticity of Defendants' Exhibit A, Jacob Cherry's status records, as it omits CCSD000939 and the notes reflected at date entry of 5-19-2011.[4]

Further Key Rebuttal events are as follows:

1.  It is undisputed that Jacob Cherry attended CCSD between 2007 and 2013 as a non-verbal autistic child of African-American descent. Jacob requires under federal law an IEP with related services due to his autism.

2.  In the 2009-2010 school year, Jacob was assigned to Bartlett Elementary School by CCSD.  His special education teacher Ms. Johanna Cavenness quit, and was replaced by a long term substitute, Ms. York.

---

[2] Order 92.
[3] Amended Complaint, Cause of Action 2 asserted violations of equal protection on both race and disability grounds.
[4] Ex. 1.

3.  As a result, Jacob was held back due in the KIDS program – a prekindergarten program – rather than entering a primary level autism class.  It also caused Alexandria to quit her job to spend her time rehabilitating Jacob's education, including potty training and non-verbal communication, causing financial damages to Jacob, Alexandria, and David as well. [5]

4.  CCSD then assigned Jacob to Twitchell Elementary School for the 2010-2011 school year without the required transition plan or his services in place.[6] Principal Smith places blame on CCSD for this as a material omission.[7] She testified that her district supervisor Dr. Eva White failed to respond as they tried to "correct an IEP and services that weren't in place" and that "she knew he came from Bartlett without a transition plan in place."[8] Nor was a behavior plan developed until September 21, 2010.[9]

5.  In September - October 2010 Jacob's behavior began to deteriorate, especially after lunch, into tantrumming and head banging.[10]  Jacob's distress after lunch became so great D'Lene May needed to restrain him. [11] Jacob came home to Alexandria often hungry, unduly thirsty, soiled or smelling of urine.  Alexandria witnessed his deterioration and began volunteering in the classroom to help, especially after lunch.[12]

6.  D'Lene May suspected that Jacob wasn't eating during lunch. On or about, October 11, 2010, she entered the cafeteria to confirm her hypothesis.[13] She entered the lunchroom and observed Jacob with the other children and the two classrooms aides, Erica Buenrostro (formerly Arcos) and Kayla Vucekovitch.  Jacob's lunch was in front of him unopened and he was not eating, although he was clearly hungry because he tried to take food from other children.  D'Lene May immediately removed Jacob from the cafeteria

---

[5] Ex. 4, A. Cherry response to Interrogatory 20, Ex. 5, Paystubs.
[6] Ex. 34, Response to Interrogatory 6.
[7] Depo. Smith Ex. 2. 26:21-28:12, discussing the lack of a transition plan.
[8] *Id.*88:25 – 101:10.
[9] Def. Ex. D
[10] A. Cherry responses to Interrogatories 20., Depo. A . Cherry, Ex. 4
[11] Def. Ex. H, 93.
[12] *Id.*
[13] Ex. 36 P.34: 23 – 39:24.

and began to feed him herself in the classroom.  Jacob's behavior improved after her intervention "he seemed calmer, happier."

7. There are substantial contradictions in the record as to whether Ms. Piilo used or refused to use a picture exchange communication system with Jacob prior to December 2010. [14] After April 2011, the witness testimony of Rosalind Spellman reflects Piilo didn't work with him at all.

8. On December 10, 2010 Piilo filed an IEP with Plaintiffs' forged signatures for Jacob. She admits this event but blames the district. [15]

9. On December 16, 2010, the District sent a Notice of Three Restraints to Principal Smith. Under Nevada Law, three restraints requires an administrative investigation into the circumstances.  As of December 16, 2010, four restraints had been done.[16]

10. The only staff who reported an injury from Jacob were those untrained in the use of restraints.[17]

11. On December 16, 2010, then on January 5, and January 7, Smith sent emails accusing Jacob of injuring "every adult in the classroom," including breaking Ms. Piilo's arm and Kayla's fingers. [18] These emails were courtesy copied to Piilo.

12. The Defendants have agreed that Jacob was placed correctly into a self-contained classroom.[19]

13. On December 17, 2010 a special schools referral was initiated against JACOB with the intent of removing him.[20]  The intent to remove Jacob was confirmed by Gail Pubols, who heard it from Kayla, based on forwarded texts believed to have originated from

---

[14] Contradictions exist throughout the record – Ex. 10, 11, 28 "teacher couldn't use PECS until she took class" in December 2011, Ex. 13 Emails of December 17, 2010 beginning PECS.
[15] Defendant's Exhibit B & C introduce the two versions, the one Alexandria signed and the one she received from CCSD that Piilo filed.  See admission at Piilo Depo Ex. 27 75:3-76:7, also A. Cherry's depo. 37:15.
[16] Ex. 12.
[17] Ex. I Notice of Injury or Occupation Disease as compared to Ex. 7, Training Records
[18] Ex. 11 authenticated at 35 RFA 3-6.
[19] See, for example, Ex.3 written by Piilo in May 2011.
[20] Ex. 13.

Piilo.[21] Throughout her deposition Piilo testified she did not know anything about a special school; but the email correspondence between her and Dr. Cathy Scott records directly contradict her testimony. [22]  Kayla V. texted Gail Pubols "Fw: I'm sad to say this but i dn't think anything is going to happy with jacob But dnt say anything yet cuz we dnt kno wats guna happen."[23]

14. On only one documented incident was Jacob ever in fact harmful to another student, which was on an unidentified date and time Jacob pulled a bow from a girl's hair.  This is colloquially referred to by the parties as the "bow incident."  All other allegations against Jacob are unsubstantiated, and either exaggerated – such as first attempts to communicate with others - or flatly fabricated. [24]

15. On January 10, 2011 Jacob's parents filed a due process to stop Jacob's removal to a special school. This cost them $2500.00. [25]

16. The Cherry family was subsequently ostracized by the other parents in the classroom, so much so that they ceased participating in school activities and field trips due to the hostility.

17. Beginning on January 6, 2011, Susan Smith received several Letters of Complaint demanding removal and also documenting his isolation within the classroom.[26] A parent letter by Gail Pubols observed that Jacob remained in the class, "separated from the rest of the students.  He is not able to join in any class activities."   Other parent letters reported to SMITH that Jacob is getting through his "barriers" in the classroom and getting to her kids.[27]

---

[21] Ex. 38 Depo. G. Pubols 14:16 – 15:13, "Just that there's an IEP coming and we're hoping to –hopefully Jacob would be gone," continuing at 49:11 – 51:5 regarding the plan to send Jacob to Twitchell of Miley or another school.
[22] Ex. 13.
[23] Ex. 19, Auth. By G. Pubols at Ex. 38 46:5 – 46:19.
[24] See Ex. 9 @CCSD000656, email exchange regarding PECs implementation, "this may J's first attempt to communicate with other students." Also Depo. May,
[25] Ex. 1, Ex. 14.
[26] Ex. 21. CCSD002642, Auth. By Smith in Depo ( Ex. 2) as Exhibit 7.
[27] Id.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18. On Feb. 2, 2010 SMITH faxed CCSD that one of the aides [Kayla Vucekovitch] babysat for parents, "young and dumb" and "too much information may have been exchanged." CCSD faxed SMITH back and instructed her "FYI – do not act on this yet.  We'll talk." The handwritten notes on cover state "No headbanging at Bartlett or Gibson, didn't have any communication, not intentional" and "TOR [Teacher of Record] was sabotaging, told them not to work w/him" "Even principal was on side on T[eacher]."[28]

19. On Feb. 7, 2010 SMITH held a Summary of Conference with Kayla Vucekovich regarding her breaches of confidentiality for Jacob Cherry.[29] Per Smith's deposition, <u>she did not investigate the type or amount of information.  She did not notify the Cherrys.</u> No remedial training in confidentiality was ever conducted. Smith did a conference with Kayla, Smith admits she failed to investigate the information disclosed by Kayla, either the amount of information, identify the source of the information as Piilo, or to take follow up actions with Kayla, even though she continued to have reports into June 2011.[30]

20. In February – May 2011, CCSD's Compliance and Monitoring did an internal investigation and made the following findings as to Twitchell Elementary School:

    a. "Teacher may say she will follow through with any strategies and but not has been observed to do so -> directions given to aides told aides not work w/ him

    b. LIDT thought there was an active campaign to get rid of student ASAP by complaining how harmful and aggressive he was."

    c. LIDT thought teacher was sabotaging the situation so he would move, told aides not to work with him.  Heard teacher tell other parents "don't worry I won't let HIM hurt your little girl." [31]

21. On April 11, 2011 Ms. Spellman became Jacob's full time aide.[32]   An African-American, she was required to sit behind the barriers with Jacob and not allowed to

---

[28] Ex. 23.
[29] Ex. O
[30] Ex. 2, 76:15 – 93:10.
[31] Ex. 28.
[32] Ex. 25 41:18.

come out.  She reports that Piilo would not instruct Jacob, would not give instructions to her, nor prepare classroom materials for Jacob.[33]  She wrote "I'm not the teacher!" Her testimony directly contradicts that of Sandra Piilo on almost every level.

22. On April 12, Russell Holmen with CCSD came into the classroom to observe.  On the day of Mr. Holmen's observations, Piilo took the rest of the class and marched off to an assembly, leaving Holmen, Spellman and Jacob in the classroom without materials or instructions.

23. Ms. Spellman also documented problems with aides during lunchtime: One day she heard Jacob crying during lunchtime. When she approached, she found him seated at one end of the lunch table, with all the aides and other children at the other end.  His food was in front of him and he was covered in it, crying. After that Ms. Spellman began to take her lunch with Jacob.  She told Piilo, who did nothing.[34]

24. Of that time, she states she felt like Rosa Parks on that bus, referring to the incident of segregated seating that commenced the Civil Rights movement.[35]  Ms. Spellman kept a journal.  She wrote in her journal "I'm in hell."[36]

25. After the Due Process was withdrawn in April 2011, Piilo, with instruction by Smith, used lockdown procedures when Alexandria Cherry came to the classroom – covering the window and locking the door.  First Piilo denied it ever happened and blamed the Due Process, then she changed her story under oath and admitted a lock down happened once. Ms. Spellman deposed this happened three to four times, Piilo admits to only once.[37]

26. In April and May 2011, Piilo was observed by Spellman lying to Alexandria Cherry about Jacob participating in circle time.  When Ms. Cherry arrived in the afternoon, Piilo stated Jacob attended circle in the morning.  When Ms. Cherry arrived in the

---

[33] Ex. 25 54:1 – 57:13.  Rosalind Spellman testified extensively and directly that Piilo never worked with Jacob, and never provided supplies or materials for Jacob.  Spellman brought her own.
[34] Ex. 43 72:14 – 74:8.
[35] Ex. 25 47:4 – 48:20, 57:21 – 59:3.
[36] Ex. 25 68:6 – 68:23.
[37] Ex. 25 Depo Spellman, 49:12- 52:16. Compare to Depo Piilo, Ex. 27 157:6 – 160:21, ending with "No.  I know. And at first I thought, No, I would never do that, then I thought, Well, maybe I did."

morning, she stated that he will participate in the afternoon.  Or that Jacob gets too excited.  Or that he must learn to behave first. [38]

27. In mid-May, Pillo began to give Alexandria upbeat updates regarding Jacob participating in "specials" with older children & music & circle time.  Piilo refused to provide Rosalind Spellman with instruction, or materials, so Ms. Spellman took JACOB to play with another classes writing in her journal "I have no one – no one is here for us, that's okay – JC and I." [39]

28. As part of their investigation, CCSD determined that Jacob lost or was denied educational benefit during his year at Twitchell.  Ex. 32.

29. On May 19, a conference was held between Michael Harley, Esq. and Susan Smith who did not believe his findings.  She stated that she simply didn't believe it and the aides were working with him because she'd seen it herself.[40]

### III. LEGAL ARGUMENT

The purpose of a Motion for Summary Judgment is to avoid unnecessary trial by disposing of allegations which are unsupported factually. *Fleming v. Las Vegas Metro. Police Dep't* (D. Nev., 2013) .  An issue is "genuine" if there is sufficient evidentiary basis on which a reasonable fact-finder could find for the non-moving party and a dispute is "material" if it could affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248-249 (1986). In this case, there are more disputed facts than undisputed facts, requiring a fact finder to "resolve differing versions of the truth at trial."  *Aydin Corp. v. Loral Corp.*, 718 F. 2d 987, 902 (9th Cir. 1983).

a. **PLAINTIFF'S 42 USC 2000d Claim**

Plaintiffs have alleged that CCSD, Piilo and Smith subjected Jacob Cherry to discrimination within his classroom.  42 USC 2000d states "no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

---

[38] Ex. 4: Date Entries April 11-15, 2011; April 25-29, 2011; May 2-6, 2011.  See also depo Rosalind Spellman, Ex. 25 54:1 – 54:15.

[39] Ex. 25 63:8 – 64:24, 68:12.

[40] Ex. 2 96:8 – 103:25.

federal financial assistance."  It is undisputed that Defendant Clark County School District receives federal funding and this has not been challenged.  Title VI  explicitly prohibits "de jure or de facto segregation by race in the school of the local educational agencies of any State shall be applied uniformly in all regions of the United States <u>whatever the origin or cause of such segregation</u>." 42 USC 2000-d6 [emphasis added]. Here the source was the parents, although CCSD was the instrument.

Plaintiffs may prove racial discrimination either under the burden shifting scheme of Title VII case or by circumstantial or direct evidence.  *Woods v. Wright Institute,* 141 F. 3d 1183 (C.A.9 (Cal.)( 1998), *Diaz v. American Telephone & Telegraph,* 752 F.2d 1356. However, they must prove intentional discrimination under Title VI.  *Hale v. Vacaville Hous. Auth.* 2 (9th Cir. 2012).

In this case, the Plaintiffs point to the admissions of Principal Susan Smith for direct evidence of segregated seating with discriminatory intent within the classroom. Principal Smith has been questioned on a letter regarding safety concerns in her class and Jacob not being able to get through the "barriers."  She testified as follows, reproduced in whole at Exhibit 2, pages 143 - 148:

 "Q: Is it your opinion that the work area Jacob was supposed to be placed in was to be a barrier?

A: No.  And this parent was very misinformed.  This is a parent that, I believe, had more issues than what he shared with us."...

...

Q: Was he [the parent] prejudiced in terms of color?

A: Yes.

Q: Was he prejudiced against – do you believe he was prejudiced against Jacob Cherry because of his color?

A: I do.  Is this going to get back to him?  I just know because he'll call me and I – I mean, I've already dealt with him once on it anyway.

... [break]

1    A: I walked in just as the conversation was starting and let them know that I would be

2  joining the conference because based on this letter I needed to be there.

3    Q: So this was right after the letter came through?

4    A: Yes.

5    Q:  Okay.

6    A: And I asked him, you know, what are your concerns?  Let's just get to the bottom of

7  it.

8    Q: Concerns regarding Jacob?

9    A: Concerns regarding the entire classroom.  He kept going to Jacob and the bow, the

10  bow, the bow.

11    I said, okay, I understand that and there's things that we can do to rectify to ensure that

12  your daughters are as safe as we can possibly ensure.  Obviously, things happen, they're kids,

13  but we'll ensure safety as best we can.

14    I said are there any other concerns?  And he kept going back to it.

15    And I said, sir, we're going to do this.  This it the best that we can do.  And I said I don't

16  get—so what else is there?

17    He just kept beating around the bush.  There was never a time that he said I'm

18  prejudiced or I don't care for people of his race or whatever, but it was just a feeling that I got

19  because we weren't getting anywhere as far as what the root of the issue was.  And it just was –

20  just the way he was beating around the bush and we weren't getting anywhere and I know – I

21  don't know.  I shouldn't say.  But I felt Nanda and I were on the same page.  She sort of gave

22  me a look and I gave her a look and that was about it.  It was just a feeling that I had because he

23  couldn't come up with any other reason and he just – I don't know.  I can't even recall exactly

24  what it was, but I just – both Nanda and I gave each other a look that we were feeling that way.

25    Q: And he wanted Jacob kept from his daughters?

26    A: Yes.

27    Q: Or his kids? Sorry.

28    A: Yeah, that's okay.

Q: His kids?

A: In fact, he pulled his daughters out for a week and asked, you know, was anything going to be done.

And I said what will be done is what we already spoke about.  And what that was is circle time we had – it's like a half circle.  It's not a full circle because they're facing a bulletin board.

So what we did is –or Sandra did is she had Jacob on one side with some kids and the twins on the other side with some kids so that they wouldn't have the ability to interact, if that makes sense.

Q: So they were kept apart then?

A: Right.  Like I said, he never said that, but it was just a- I don't know.  I just could feel it.  I don't know how to…" Ex. 2 148:6.

D'Lene May, a licensed itinerant teacher, was also informed to keep Jacob separated from certain students "because he scared them and their parents were concerned that he might hurt them."  [41] She also heard Piilo say that he couldn't come out of his area.[42] Ms. Spellman, his African American aide, was also told in the Spring that Jacob wasn't allowed to go near these students. At the very least, "safety" was a pretext for race, because the only known incident in which Jacob had any adverse contact with any other child was the bow incident.[43] Defendants have not presented a single episode where Jacob injured another child.

Nonetheless, Smith sent all letters, including this one, to CCSD in support of her request for removal of Jacob.  Susan Smith's job description explicitly delegates authority to her to "Conduct supervision and evaluation activities and processes that actuate teaching for learning and *comply with law, policy, regulation, and negotiated contracts.*"  [Emphasis added.]  Safety as pretext for racial discrimination is clearly a trial issue.  Plaintiffs' allegations are supported by substantial evidence sufficient to send this to trial.

*** IV.a, as to PIILO and SMITH

---

[41] Ex. 36  72:13 – 73:9.
[42] Ex. 36  66: 8-18.
[43] This fact is abundantly testified by Sandra Piilo, the teacher, and Gail Pubols, the parent.

1    Although Plaintiffs agree a claim does not lie against the individuals under the statutory

2    frameworks of Title VI, Defendants Smith and Piilo should <u>not</u> be dismissed from suit at all, as

3    they remain liable for violations of §1983 action for violations of equal protection. *Darensburg*

4    *v. Metro. Transp. Comm'm*, 636 F.3d 511 (9th Cir. 2011);  See *Miranda B. v. Kitzhaber*, 328

5    F.3d 1181 (9th Cir., 2003), *Alexandriaander v. Underhill*, 416 F.Supp. 2d 999 (D. Nev. 2006).

6    In *Hafer v. Melo*, 502 U.S. 21 112 S. Ct. 358 (1991), the Supreme Court explicitly held §1983

7    liability is to redress deprivations against those who carry a badge of authority of a State and

8    represent it in some capacity, whether they act in accordance with their authority or misuses it."

9    *Id at* 28 citing *Scheuer v. Rhodes,* 416 U.S. 232, 243, 94 S.Ct. 1683 (1974).

10    Plaintiffs originally pled violations of Equal Protection on the basis of race. Amended

11    Complaint, CA II, 23-33. The admissions of Smith, that while acting as the administrator of

12    Clark County School District, under color of law, she and Piilo seated Jacob by race and refused

13    him contact with other children.  This racial discrimination creates a genuine issue of material

14    fact.

15       b.  DEFAMATION

16    The defamation analysis is squarely governed by Nevada Law and generally requires 1) a

17    false and defamatory statement by the Defendant concerning the Plaintiff, 2) an unprivileged

18    publication to a third person; 3) fault, amounting to at least negligence; and 4) actual or

19    presumed damages.  *Pegasus v. Reno Newspapers, Inc.* 118 Nev. 706, 57 P.3d 82 (Nev. 2002).

20    The Nevada Supreme Court has adopted the *New York Times Co. v. Sullivan* standard for

21    malice as "reckless disregard for the truth of the statement asserted." *Id.* 90. A statement is

22    defamatory if it "would tend to lower the subject in the estimation of the community, excite

23    derogatory opinions about the subject, and hold the subject up to contempt." *Pegasus v. Reno*

24    *Newspapers, Inc.* 57 P.3d 82, 88 (2002).  If a reasonable person would understand the statement

25    as "mere rhetorical hyperbole" then the statement is not actionable.  *Id.* at 88.

26    On December 16, 2010 Principal Smith received a Memo of Three Restraints regarding

27    Jacob.[44]  Under the laws of Nevada, the record of three restraints triggers an investigation,

28

---

[44] Ex. 12.

1   including a supervisor review.  Immediately thereafter on December 16, 2010 and twice on

2   January 5, 2011, Smith sent three libelous emails[45] to the District, staff, and Piilo stating:

3         On December 16: **"...He [Jacob Cherry] has injured every adult in the room at this**

4   **point...fractured the teacher's arm, injured one of the SPTA's back, and fractured the**

5   **other SPTS's two fingers on one of her hands.)...his severely aggressive behaviors, the**

6   **education for all other students in this program has stopped...When this student becomes**

7   **aggressive (which lately is all day every day) the rest of the class must be removed (for**

8   **their safety)....The parent took a leave from her job for a year to try to work with her**

9   **child and the school system to assist with his behavior and academics."** [emphasis added]

10        On January 5: "**JC's extremely aggressive behaviors. ...He has fractured the**

11  **teacher's arm, fractured one of the aide's two fingers, as well as bruised up many other**

12  **body parts.  He has also injured several of the students in this class (of course BOTH of**

13  **this parent's daughters).... He truly is a danger to himself and others**. **I truly feel that he**

14  **needs a placement in which he has direct one-on-one assistance with an area that is well-**

15  **padded for when he has a breakdown (which is many, many times throughout the day...."**

16  [emphasis added]

17        Kayla Vucekovitch – the aide referred to in the emails - broke her fingers in a domestic

18  violence dispute, which she told people, including Smith, at the time.[46]

19        Regarding Sandra PIILO's injury on November 15, 2010, Piilo testified: "Is it your

20  testimony that Jacob Cherry didn't break your arm?  A. No, he didn't break my arm, he was

21  down the hall, I was running after him."[47]  Erica Arcos witnessed this event, and described

22  "...she pretty much hit herself with the door."

23        But instead of investigating as she was required to do, Smith wrote, on January 5:

24  **"...What needs to happen to make a change that is appropriate for this student?  Who**

25  **else does he need to hit, fracture a bone, pull hair from their head, or cause back damage**

26  **due to his severe acting out behaviors?....We are not effectively meeting his needs here or**

27

28
---
[45] Ex. 11 authenticity admitted.
[46] Ex. 33 12:12 - 13:22; Ex. 27 70: 1 -8, Ex. 36 56:  7-11.
[47] Depo. Pillo Ex. 27 60: 16-19, 59-60 *passim*.

1  the needs of the rest of the class because nothing can be taught once this student acts

2  out…which is the majority of the day….” [emphasis added]

3      These statements were forwarded to Piilo and then spread by Kayla to the parents.   The

4  parents responded with horror, writing letters to Principal Smith to have Jacob removed.

5  SMITH, an administrator with 22 years experience, knew the impact of her words in the

6  educational community when she wrote on January 5: "…the parent I met with

7  today…[couldn't speak] without breaking down crying because she is so stressed out and

8  worried about her daughter's safety…Honestly, I cannot guarantee that J.C. won't go

9  after her daughters again in the classroom.  We will do our best to keep him away but he

10  is very fast and very strong …." The record, by every defendant and witness including Smith,

11  is that Jacob never injured any child.

12      Later that same day "From what I have heard concerning the parents from this

13  program is that the next time a child is or a staff member is injured will be the last time

14  for the parents (students) in this program.  They ALL plan to pull their children, place

15  them in another program, and then file a lawsuit against us and the family of this child…"

16      The key issue here is not, as Defendants attempt to argue, that an administrator was

17  asking for help.   The jury issue, encompassing the question of malice, is whether Smith

18  repeated false statements by Piilo and Kayla to have Jacob improperly removed from her

19  school. Plaintiffs point to the following evidence supporting a genuine issue of material fact:

20  1.   The administrator for the Kids Program was Assistant Principal Cathy Vernon.[48]  Smith

21      was exceeding her authority when she became 'involved' in the Kids Program. Smith

22      did not review the October incident reports until February 2011, she did not make

23      referrals to campus police, and had ongoing private meetings with Kayla Vucekovitch.

24      In fact, when Michael Harley met with Smith on May 18, 2011 in what seemed like a

25      "disciplinary conference, Attorney Michael Harley initially expressed concerns that

26      Ms.Vernon had not "done more so as far as disciplinary with the teacher or follow

27      through with the teacher based on what the observation had shown."[49]

28  
[48] Depo Smith Ex. 2, 23:9 -15
[49] Id. 98:10 -20.

2. That the timing and context of these emails suggest that they were improperly motivated by the Notice of Three Restraints memo, received within forty eighth hours of her first email.  The remaining emails were sent upon return from Christmas break.

3. Smith denies her statements were exaggerations. Smith testifies she was only repeating what Kayla and Piilo told her.[50] Both Kayla and Piilo deny saying these things.

4. At least one of the concerns was about race, because the 'bow' incident already discussed *supra* as a proxy for race.

5. CCSD has documented that the emails were sent in the mistaken belief that complaining about Jacob would help 'get rid of him.'[51]

6. SMITH referenced her desire to institutionalize JACOB in her email of January 5 in which she stated, "I truly feel that he [JACOB CHERRY] needs a placement…with an area that is well-padded for when he has a breakdown."

7. Gail Pubols, the parent of one of the other children in Jacob's classroom, was aware of the pending removal, and referenced the forwarded texts by Kayla V., including that there must have been a "leak" to the Cherry family, or else they would not have filed Due Process.[52]

8. It cost Jacob Cherry and his family $2,500.00 to stop the removal initiated by these emails.

The Defendants also move for summary judgment based on the defense of conditional privilege.  This is a question of law for the court to determine. *Circus Circus Hotels, Inc. v. Witherspoon, 99 Nev. 56,* 657 P.2d 101 (Nev. 1983).   Conditional privileges are an affirmative defense which the Defendants must not only assert, but also prove.  *Pope v. Motel 6,* 114 P.3d 277, 284 (Nev. 2005) *Simpson v. Mars Inc.*, 113 Nev. 188, 929 P.2d 966, 968 (Nev. 1997).  The law of defamation in Nevada has evolved to provide an incentive for people not to spread lies that can injure others, including the workplace. *Id.* To be privileged these communications must have occurred in the regular course of business.  *Id.*   Additionally, a conditional privilege may

---

[50] Ex. 2 49:20-23.
[51] Ex. 28.
[52] Depo. G. Pubols, Ex. 38  49:14 – 24.

be abused by publication in bad faith, with spite or ill will or some other wrongful motivation toward the plaintiff, and without belief in the statement's probable truth. *Circus Circus* 101. Actual malice is defined as "knowledge that the statement was false or with reckless disregard of whether it was false or not," acting with a high degree of awareness of the probable falsity. Recklessness may be established through cumulative evidence of negligence, motive, and intent. *Pegasus v. Reno Newspapers, Inc.* 57 P.3d 82, 93 (2002).

The Defendants cannot prove the existence of privilege, because although they place great weight on the responsibilities of Smith for the school, she was first and foremost acting outside of her authority, but which was the job of Cathy Vernon.  Second, her job description does not elevate safety & racial discrimination above compliance with law, policy, regulation, and negotiated contracts. Further, by the express statements and those later, she wasn't asking for help – she was asking for Jacob to be removed from her school.  It was Smith's job as an administrator of CCSD to know whether or not her allegations were true prior to making such potentially damaging statements, and she had the investigatory documents in her possession.[53] Smith affirmatively testified that she was not the direct supervisor of the KIDS program, but that role fell to Cathy-Ann Vernon, the Assistant Principal.[54]

In the normal course of business, Smith would have a) supervised the lunchroom, b) conducted a supervisor review of Ms. Piilo's injury and Kayla's lack of one, so as to be properly informed, and c) conducted an investigation of the Three Restraints as required by law.

A genuine issue of material fact also exists as to the statements by Kayla Vucekovitch to other parents.  Specifically, Kayla spread lies in furtherance of her employment that Jacob had picked up and assaulted a smaller student among others that Jacob was dangerous, among others.[55]  In Nevada, an action lies for respondent superior for negligent and intentional torts committed in the course and scope of his employment unless exempted by NRS 41.745. *Woods v. Safeway*, 121 P.3d 1026, 1034-1035,  121 Nev. 724 (Nev. 2005).  As testified, these false

---

[53] Ex. 2 9:25 – 10:5, stating she has final supervising authority her school.
[54] Ex. 2, 23: 2 – 23:20.
[55] Depo. G. Pubols, Ex. 38 at 11:5 – 11:9.

disclosures were made both on and off grounds and the letters by the parents are evidence of reputational damages.  Sufficient evidence exists to send this matter to the jury.

c. INVASION OF PRIVACY / FALSE LIGHT

As Defendants state false light redresses the shame and humiliation of having private information disclosed. *People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.* 111 Nev. 615, 622 n.4 (1995) overruled on other grounds by *City of Las Vegas Downtown Redevelopment Agency v. Hecht,* 113. Nev. 664.  This tort requires that objectively private information was disclosed, and while a false light claim <u>may</u> be based on a disclosure that is also defamatory, <u>there is no requirement for it to be so</u>.  *Barket v. Clarke, 7 (D. Nev., 2012)*. For the purposes of this motion, the following breaches of confidentiality were publicized with a false light:

- The emails by Smith regarding Jacob Cherry, previously discussed under defamation.
- Kayla Vucekovitch disclosed details from JACOB's medical files, specifically from 2008 regarding a near drowning stating that it had worsened Jacob's condition. [56] Kayla also testified that PIILO gave her this information.[57]
- Disclosures that DAVID CHERRY took an early retirement from the New York City Police Department in 2004 with the intention of suing the District. [58]
- Details of Jacob's IEP meetings, placement status, and Due Process throughout the Winter Spring of 2011.[59]

Personal information including Medical information, IEP meetings, placement, and due process are confidential as a matter of law.  Defendants now rely on CCSD R-5125.1 to argue that Kayla had a "legitimate educational interest" in Jacob's private information.  But the Defendants failed to comply with the governing regulation NAC 388.289, which provides:

---

[56] Ex. 33 depo Kayla 15:17, depo G. Pubols Ex. 38  18:4 – 13 "..after he'd initially been diagnosed that there had been a near drowning incident that may have added to Jacob's disability and that it might be a disability on top of autism. Q: Did she tell you the nature of that disability? A: She implied, you know, some brain damage from a near drowning incident."
[57] Ex. 33 15:20.
[58] Ex. 29, authenticated by G. Pubols at subsequent deposition, attached hereto as Ex. 38, 41:4, also see 24:2.
[59] Ex. 26, Ex. 24, Dep. G. Pubols. Ex. 38 18:21 – 19:1 "She said there was a due process so Jacob wouldn't be leaving."

**NAC 388.289  Confidentiality of records:**

1.  Each public agency shall, pursuant to the provisions of 34 C.F.R. §§ 300.610 to 300.627, inclusive:

(a) Protect the confidentiality of personally identifiable information at its collection, storage, disclosure and destruction;

 (b) Appoint one official to assume responsibility for ensuring the confidentiality of any personally identifiable information;

(c) Train or instruct all persons collecting or using personally identifiable information regarding these policies and procedures; and

(d) Maintain a current listing for public inspection of the names and positions of those employees within the school district who may have access to personally identifiable information.

...

3.  A public agency shall not disclose personally identifiable information except as authorized by law.

4.  A public agency may include student teachers and related service interns among those persons who have a legitimate educational interest in accessing educational records pursuant to policies developed in accordance with the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, and the related regulations.

Under state law as set forth above, CCSD "may include student teachers and related service interns among those persons who have a legitimate educational interest in accessing educational records pursuant to policies developed in accordance with the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, and the related regulations." An aide with a high school diploma is neither a service intern nor a student teacher.

As a matter of law, the school district cannot establish any set of facts or circumstances by which a lower level aide who changed diapers with one semester of college, could have a legitimate educational interest in JACOB's medical file from 2008.[60]  Kayla was not a member of Jacob's team, never attended his meetings, and the Due Process operates at the State and District Level and is also confidential.

The Defendants argue Kayla was a 'rogue aide.' But she only disclosed information and misinformation gained in the course of her employment, and misuse of this information was foreseeable as a part of her employment.[61]  Gail Pubols[62]  affirmatively testified that Kayla

---

[60] Ex. 33, 8:2.

1  discussed Jacob on school campus, on school trips, during lunch, as well as outside school

2  times.[63] Rosalind Spellman, the aide who was assigned into the classroom in April 2011, also

3  chided Kayla for discussing JACOB <u>in the classroom</u> with other parents. [64]

4  As to the reasonable person standard of offensiveness, the disclosures violated the law.

5  Ms. Pubols that she and her husband "were uncomfortable knowing such *intimate* details about

6  another student" [emphasis added].[65]   Smith herself recognized the offensive nature of the

7  disclosures when she advised Kayla she could be subject to suit and further stated at deposition:

8  "...they [the parents] even said to her [Kayla] are you supposed to be talking about this and – so

9  then they came and spoke with me." [66]Then, throughout the Spring of 2011, Kayla continued to

10  have access to information and share it. [67]

11  d. NEGLIGENT SUPERVISION

12  This court has repeatedly found that supervision and training of employees is not a

13  discretionary act subject to discretionary immunity arising under NRS 41.032, but an

14  affirmative duty of the employer to use reasonable care in the training, supervision, and

15  retention of his or her employees to make sure the employees are fit for their positions. *Pitti v.*

16  *Albertsons, LLC (D. Nev., 2012),   Alexandriaander v. Underhill,* 416 F. Supp 999, 1013 (D.

17  Nev. 20006), citing *Herrera v. Las Vegas Metro Police Dep't,*  298 F. Supp. 2d 1045, 1054-55,

18  (D. Nev. 2004) and *Hall v. SSF Inc.*  This is not a negligent hiring case, which is the standard

19  cited incorrectly by the Defendants in their moving papers. *Jane Doe A. v. Green,* 298 F.

20  Supp.2d 1025, 1039-1040 (D. Nev. 2004). Although linked, the standard for negligent

21  supervision is distinguished as an ongoing duty of care, not simply limited to the actual or

22  constructive knowledge of dangerous propensities.  *Id.*   The Plaintiffs point to the following

23  evidence of negligent supervision by the parties:

24

25

26

27  [64] Ex. 29.
[65] at Ex. 29

28  [66] Ex. 2, 72:6.
[67] See Depo R. Spellman, Ex. 25 60:25 – 61:1.

1.   During his first year at Bartlett, Ms. York, who as a matter of law, was not qualified to run a special education class [68] and therefore lacked the necessary expertise to educate him.

2.   CCSD assigned students without regard to the needs of the children or the training of the personnel.  Jacob entered Twitchell without a communication system, transition plan, behavior plan, or occupational therapy or speech services in place, which are required for a student entering with an IEP. [69]  These were material omissions, as testified by Smith, and they did not have the trainings to handle him.[70]

3.   The staff at Twitchell were untrained in picture exchange system for nonverbal children, ABA, restraints or confidentiality.[71] These deficiencies were noted multiple times by CCSD and not addressed.  Every single Notice of Occupational Injury was filed by staff untrained in restraints, who then attributed the source of the injury to Jacob, rather than their unsafe performance or non-performance of a restraint.

4.   Principal Smith directed Piilo and the aides to get CPI training, which was offered every couple months through the District.[72]  The aides never took it and Piilo no showed to her training on January 18, 2011.[73]  Smith never followed through but was certain they took. However, she specifically admits her school did not have the training for Jacob and she knew it.

5.   The need for training was again identified by the District Level by Nanda Rowe but never followed through. On January 4, 2011 she requested the names of the aides to schedule the training. [74]

6.   PIILO refused to implement a nonverbal communication system with Jacob until her training in December, 2010, even though she had been trained in nonverbal communication in January, 2010, and October, 2010.[75]

---

[68] NAC 388.165
[69] Ex. 2.
[70] Ex. 2 39:1 – 22.
[71] *Id*, Ex. 7.
[72] Ex. 2: 41:23 – 42:21, 56:9-21.
[73] Ex. 7
[74] Ex. 16.

7. The aides assigned to the lunchroom were directly supervised by Susan Smith which is when and where Jacob was left hungry. [76]

8. According to Principal Smith, the District was non-responsive to her requests for assistance for a floater which 'caused' her to send the emails she sent.[77]

9. As of February 4, 2011 Susan Smith and the Administrators of CCSD had actual knowledge that Kayla Vucekovitch was unfit to work with Jacob and breaching his confidentiality.

10. CCSD staff observed Jacob being excluded from his class, knew Spellman had no materials, and failed to intervene. [78]

11. Smith wrote "Ms. Vucekovich had been sharing confidential information about a child with autism, in which a due process has been filed." Smith confirmed at deposition this was Jacob and admitted she did not investigate the details of the breach, such as how much information was shared, and most importantly its source.

IV.b.  DEFENDANTS PIILO AND SMITH (Title VI addressed above)

Defendants assert discretionary immunity in defense to the state law tort claims.  NRS 41.031.   The threshold question is whether the decisions are discretionary, to which the answer is NO.   All the torts asserted above are affirmative, non-delegable duties which fail the *Berkovitz-Gaubert* test for discretionary immunity as applied in Nevada.   *Martinez v. Mariszczzak*, 123 Nev. 443, 446, 168 P.3d 720, 728 (2007).

Nevada applies the two prong *Martinez* test as articulated in *Berkovitz*, where an act by an official must involve discretion or choice, and <u>whether the judgment or choice involves social, economic, or political policy considerations</u>.  *Martinez v. Maruszczak,* 168 P.3d 720, 722 (Nev. 2007) held: that although a physician's treatment decisions involved an element of choice, it did not involve policy considerations and had no discretionary immunity, *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).  Even if an act requires

---

[75] Ex. 7
[76] Ex. 2 106:20, also Depo. G. Pubols Ex. 38  42: 17 -20.
[77] Ex. 2 100:2 "I fell that for me to request assistance from September 8[th] all the way through until we did get a floater aide for assistance was completely unacceptable and very disheartening...
[78] Ex. 26, Observation report of Josh Loehr on April 12.

judgment and choice such as medical treatment, <u>if the choice does not involve social economic or political policy analysis, the decision is not entitled to discretionary immunity.</u> *Martinez v. Maruszczak,* 168 P.3d 720, 724 (Nev. 2007) *Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1067, 123 Nev. 450 (Nev., 2007).   Feeding a disabled child, as indicated by NRS 41.1395, is an affirmative duty, as are protecting confidentiality, privacy, and providing appropriate supervision. Furthermore, as documented above, Smith had stepped outside her job descriptions in her administrative duties to interfere with the Kids program.

Here, policy considerations regarding racism, feeding children and confidentiality were made legislatively, and cannot be contradicted by considerations of "staff relations, morale, resource allocation." [79] Judicial notice may be taken of the following publicly accessible sites: http://www.ccsd.net/departments/food-service/national-school-lunch-program also the State of Nevada Department of Education annual reports http://www.doe.nv.gov/FRL_Reports.   "

Further, discretionary immunity is not available if acts are taken in bad faith, which includes acts that fall outside the authority of the official. *Trujillo v. Powell* (D. Nev., 2011) at 9, citing *Falline v. GLNV Corp,* 823 P.2d 888 (1991).  "Bad faith . . . involves an implemented attitude that completely transcends the circumference of authority granted the individual or entity. In other words, an abuse of discretion occurs within the circumference of authority, and an act or omission of bad faith occurs outside the circumference of authority." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1060 (9th Cir., 2007) applying *Falline*.   If the conduct violates written policies and procedures or is based upon hostility or discrimination of some sort, discretionary immunity is also negated.  *Davis* at 1060.  Here, Smith's admissions of racial discrimination within the classroom as to herself and Piilo negate any discretionary immunity they could have had.

e. NEGLIGENT INFLICTION OF SEVERE EMOTIONAL DISTRESS

It is the public policy of Nevada that all victims of a tort be made whole including the rights of a parent to recover any expenses the parent was required to pay because of the injury to his or her minor child. *Greco v. U.S.* 893 P.2d 345, 11 Nev. 405 (Nev. 1995) *Frances v.*

---

[79] Docket 62, line 21.

1   *Plaza Pacific Equities, 109 Nev. 91*, 847 P.2d 722 (1993). Throughout the years in question,

2   Alexandria and David Cherry witnessed the deterioration of their son, witnessed him coming

3   home hungry and knew things were wrong in the classroom but were denied access and lied to

4   even as they tried to do everything in their power to intervene – quitting her job to be there -

5   and stop the slow-moving nightmare.

6         While the vehicular automobile theory advanced by the Defendants reflects the original,

7   literal application of the tort of NIED, Nevada has expanded its application to all cases

8   "negligence" using the cornerstone of "foreseeability."  *Crippens v. Sav On Drug Stores,* 961

9   P.2d. 761, 114 Nev. 760 (Nev. 1998).  This principle has been extended to situations where a

10  daughter slowly dosed her mother with the wrong medication as a result of a pharmacist's

11  negligence.  *Id.*  Negligent supervision is but one species of negligence, as much as medical

12  malpractice in *Crippens.*

13        The test in Nevada is that the precise positions of the Plaintiff or what the Plaintiff saw

14  that must be examined. *Id.*  The overall circumstances must be examined to determine whether

15  or not the harm to those witnessing another's harm was "foreseeable." Alexandria and David

16  witnessed the results of misconduct to their son both at home and at school.  Foreseeability

17  factors include the degree of relationship as well as knowledge of a witness's condition

18  *Crippens* at 126.  To the extent that any of the above torts against Jacob were found to be

19  intentional, the parents are entitled to bystander recovery as well.  *Starr v. Rabello*, 97 Nev.

20  124, 126, 625 P.2d 90, 92, (1981), *Olivero v. Lowe*, 116 Nev. 395, 995 P.2d 1023 (Nev. 2000).

21        Here, that the direct victim of most acts was a small, five to six year old nonverbal

22  autistic child, cannot be denied and this claim does not lie to him.  But Nevada does permit

23  recovery to his parents for witnessing the effects of two years of negligent and intentional torts

24  despite their valiant and continued efforts to stop it.

25        Refusing to feed a non-verbal child, leaving him hungry, as the aides in this case did, is

26  a battery.  Volunteering at school only to find your child hungry and head banging is both a

27  "technical" battery and shocking.  It is entirely foreseeable that parents experiencing the impact

28  of defamation and hostility, even if only caused by an <u>irresponsible</u> (as opposed to intentional)

district, administrator, and teacher would suffer emotional distress. Alexandria asserts her hair fell out and she suffered extreme eczema as a result of the stress of witnessing these events.[80] David lost the care and companionship of Alexandria and Jacob, as his family fell apart.

## V.  CONCLUSION

In close, it is entirely irrelevant whether CCSD attempted to provide related services required by federal law.  The question for the jury is whether Smith, Piilo, and CCSD engaged in torts and racial discrimination.  The record strongly supports the causes of action in Plaintiffs remaining claims, sufficient to send this case to the jury.

WHEREFORE, Plaintiffs respectfully request that Defendant's Motion for Summary Judgment be denied in its entirety.

Respectfully submitted December 4, 2013
By:/s/ R. Ohlinger
Roberta Ohlinger-Johnson
Bar #10946
Attorney for Plaintiffs

---

[80] Ex. 20

## CERTIFICATE OF SERVICE

This is to certify that on the 4th day of December, 2013, I filed the foregoing **RESPONSE IN OPPOSITION TO RENEWED MOTION FOR SUMMARY JUDGMENT (#95)** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel, and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Kara B. Hendricks
Mark Ferrario
GREENBERG TRAURIG, LLP
3373 Howard Hughes Parkway
   Suite #400 North
Las Vegas, NV 89169
*Counsel for Defendants*

Dated this 4th day of December, 2013.

Dawn M. DeMastrie
Legal Assistant
WARM SPRINGS LAW GROUP

*Cherry Case No.: 2:11-CV-01783*
*Opp to Renewed MSJ*