UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DAVID CHERRY, et al.,

        Plaintiff(s),

v.

CLARK COUNTY SCHOOL DISTRICT, et al.,

        Defendant(s).

2:11-CV-1783 JCM (GWF)

**ORDER**

Presently before the court is defendants' renewed motion for summary judgment. (Doc. # 95). Plaintiffs have filed a response (doc. # 99) and defendants have filed a reply (doc. # 101).

**I.    Background**

The facts of this case have been extensively detailed in prior orders. (*See, e.g.*, order doc. # 88). Only those facts necessary to the resolution of the instant motion will be revisited.

The plaintiffs in this case are Alexandria and David Cherry. They are the parents of Jacob Cherry. Jacob is autistic, non-verbal, and is eligible for special education and related services. Alexandria and David bring this lawsuit as individuals and as guardians ad litem of Jacob.

The defendants in this case are Clark County School District ("CCSD"), Susan M. Smith, and Sandra A. Piilo. Smith is the principal at Twitchell Elementary School. Piilo is a special education teacher at Twitchell. CCSD employs both Smith and Piilo.

. . .

**James C. Mahan**
**U.S. District Judge**

The crux of the lawsuit involves the accommodations that CCSD provided (or failed to provide) for Jacob, as well as claims for various related state torts.

The amended complaint initially contained ten claims for relief. (*See* doc. # 18). In its July 22, 2013, order, the court granted in part and denied in part defendants' motion for summary judgment. (*See* doc. # 88). The court ordered supplemental briefing on whether plaintiffs had administratively exhausted certain IDEA related claims, and what the status of the claims seeking non-IDEA relief were if exhaustion had occurred. After considering the supplemental briefs, the court dismissed those claims that had not been exhausted, and permitted only the non-IDEA claims to proceed. (*See* doc. # 92).

The following claims remain: (1) the sixth cause of action alleging violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; (2) seventh cause of action alleging defamation; (3) eighth cause of action alleging invasion of privacy/false light; (4) ninth cause of action alleging negligent infliction of emotional distress; and (5) tenth cause of action alleging negligent supervision. Defendants have filed the instant motion seeking summary judgment on each remaining claim.

**II.    Legal Standard**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213

1  F.3d 474, 480 (9th Cir. 2000) (citations omitted).

2  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

. . .

### III. Discussion

The court will address each claim in the manner most convenient for it, beginning with the seventh claim for defamation as it sets the backdrop for the remaining claims.

*1.     Defamation*

The general elements of a defamation claim require a plaintiff to prove: "(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 718, 57 P.3d 82, 90 (2002).

Plaintiffs' defamation claim is based on statements initially made by Piilo in an e-mail sent to Smith, and statements made by Smith in e-mails sent to her supervisors.

On December 8, 2010, Piilo sent the following e-mail, in relevant part, to Smith:

> As you know [Jacob] has always been self-injurous [sic] but has never attempted to hurt anyone else unless it was accidental while he was trying to hurt himself. Yesterday he was distressed and had been trying to hurt himself for over a half an hour (his mom was here and he didn't want to do the seat work that the other children were doing–he was trying to bite himself and hit his body, his head and bang his head on the wall and floor). The rest of the class went to recess leaving [Jacob], his mom, the speech teacher, one other student working with her and myself in the classroom. [Jacob] ran over, grabbed the little boy by the arm (he's three), swung him, and pulled him off the chair. We all ran to stop him. The other boy wasn't hurt but he could have been. The other little boy is non-verbal also.
>
> Today another parent stopped me after school and said how scared her little girl is of [Jacob] (she cries when he comes near her). I don't think he has ever tried to hurt her but after yesterday I'm not positive. The parent feels her daughter isn't getting the attention and interventions she received last year. I don't want the other children or parents being afraid of [Jacob], or feel like their children aren't getting a full program. Do you have any advice? My parents are a pretty tight-knot [sic] group and really help each other out. They consider [Jacob's] mom and [Jacob] as part of the group so they are not trying to shut anyone out. They are just concerned about their children.
>
> Thanks for any advice you can give me.

(*See* doc. #99-27, Piilo's Dec. 8, 2010, e-mail to Smith).

. . .

This triggered a follow up exchange between Piilo and Smith regarding Piilo's concerns and how to handle them going forward.

Thereafter on December 16, 2010, Smith received a "memo of three restraints" regarding Jacob. When restraining techniques are used on a student three times, Nevada law triggers an investigation and supervisor review. Plaintiffs' defamation claim further relies on a series of e-mails which were sent by Smith and apparently prompted by the memo of three restraints.

On December 16, 2010, Smith sent an e-mail to Piilo, the special education staff, and CCSD reading, in relevant part:

> I wanted to forward this onto BOTH of you so that you can see how serious things have become with this student. (Carol this is the student I spoke with you about the other day.) He truly is not placed appropriately. We do not have the support to handle this student appropriately. He is a safety issue to himself, the other students, and the teacher and SPTAs. (He has injured every adult in the room at this point. . .fractured the teacher's arm, injured one of the SPTA's back, and fractured the other SPTA's two fingers on one of her hands.) He also has hit several of the students in his class, hurting them as well. Our staff here has truly "bent over backward" to educate and provide for this child to the best of our ability, but what has happened is that because the staff is constantly having to deal with his severely aggressive behaviors, the education for all other students in this program has stopped. This happens almost daily. When this student becomes aggressive (which lately is all day, every day), the rest of the class must be removed (for their safety) or be on alert so that they are not injured by this student.
>
> The parent took a leave from her job for a year to try to work with her child and the school system to assist him with his behavior and academics. His parents are wonderful and very easy to work with but still. . .this [sic] issues are many and at this point I feel the safety of the other students and my staff is being compromised because the student is so aggressive, strong, and fast.
>
> As I stated the other day when I spoke with you, we need additional assistance as soon as possible for everyone's safety and well-being. Please let me know what supports we will be receiving.

(Doc. # 99-12, Smith's December 16, 2010, e-mail to Lucinia Eubanks, Nanda Rowe, Carol Lamkins, and Sandra Piilo) (ellipses in original).

Finally, plaintiffs rely on the following excerpts from statements made by Smith in an e-mail sent January 5, 2011:

James C. Mahan
U.S. District Judge

- 5 -

> . . .[Jacob] has fractured the teacher's arm, fractured one of the aide's two fingers, as well as bruised up many other body parts. He has also injured several of the students in this class (of course BOTH of this parent's daughters)… He truly is a danger to himself and others. I truly feel that he needs a placement in which he has direct one-on-one assistance with an area that is well padded for when he has a breakdown (which is many, many times throughout the day…
>
> What needs to happen to make a change that is appropriate for this student? Who else does he need to hit, fracture a bone, pull hair from their head, or cause back damage due to his severe acting out behaviors?. . .We are not effectively meeting his needs here or the needs of the rest of the class because nothing can be taught once this student acts out…which is the majority of the day….
>
> [T]he parent I met with today…[couldn't speak] without breaking down crying because she is so stressed out and worried about her daughter's safety…Honestly, I cannot guarantee that [Jacob] won't go after her daughters again in the classroom. We will do our best to keep him away but he is very fast and very strong …
> From what I have heard concerning the parents from this program is that the next time a child is or a staff member is injured will be the last time for the parents (students) in this program. They ALL plan to pull their children, place them in another program, and then file a lawsuit against us and the family of this child…

(Plaintiffs' opposition, doc. # 99, pg. 13-14).

Plaintiffs maintain these statements were false because (1) Piilo testified that she fractured her arm while running after Jacob as she attempted to stop him from eloping, thus Jacob did not fracture it; (2) the aide in question fractured her fingers in an unrelated incident outside of school; and (3) Jacob did not "injure" the girl, he only pulled the bow from her hair. Plaintiffs then use these distinctions as a spring board for their unsupported theory that Smith exaggerated these incidents because she wished to "get rid of" and/or "institutionalize" Jacob.[1]

"'There can be no liability for defamation without proof of falsity,' and the plaintiff bears the burden of proof regarding the statement's falsity." *Gordon v. Dalrymple*, 2008 WL 2782914, *3 (D. Nev. 2008) (quoting *Nevada Ind. Broad. Corp. v. Allen*, 664 P.2d 337, 412 (Nev. 1983) (emphasis

---

[1] This allegation refers to Smith's comment about placing Jacob in a padded area. It is clear that Smith was referring to Jacob's documented (and uncontested) tendency to bang his head on floors, walls, and other hard surfaces, and the need to secure the classroom in order to prevent Jacob from injuring himself. Plaintiffs' allegation that Smith wished to "institutionalize" Jacob is simply a gross exaggeration.

James C. Mahan
U.S. District Judge

- 6 -

added). "[A] statement is not defamatory if it is an exaggeration or generalization that could be interpreted by a reasonable person as 'mere rhetorical hyperbole.'" *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 715, 57 P.3d 82, 88 (2002). Nor can a statement be defamatory if it is "substantially" although not absolutely true. *Id.*

The court finds that the statements made by Piilo and Smith were substantially true, and therefore cannot form the basis of a defamation claim. First, Piilo testified she fractured her arm while trying to prevent Jacob from running away or "eloping." Second, the bow incident was sufficiently serious to prompt the girl to tell her parents and for her parents to contact the school. Third, plaintiffs do not dispute that classroom aide Erica Buenrostro injured her back while attempting to control Jacob, or that when Buenrostro fell she knocked over another student. Finally, plaintiffs do not dispute that Jacob frequently engages in physical and injurious protest behaviors.

"[W]ords must be reviewed in their entirety and in context to determine whether they are susceptible of defamatory meaning." *Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 484 (1993)(*citing Branda v. Sanford*, 97 Nev. 643, 646 (1981)). In the context of the e-mails as a whole, the court finds the statements made by defendants, even if slightly exaggerated, were substantially true and are not reasonably capable of a defamatory construction. *Id.* Summary judgment is granted.[2]

*2.     Racial discrimination*

Plaintiffs allege that Jacob was segregated to a corner of the classroom because he is African-American. The only evidence offered in support of this claim is that the one-on-one aide assigned to assist Jacob, Rosalind Spellman, is also African-American.

---

[2] Even if the statements did not qualify as "substantially true," the court finds they would have been protected by the qualified privilege. *See Circus Circus Hotels, Inc. v. Witherspoon*, 657 P.2d 101, 105 (Nev. 1983)("A qualified or conditional privilege exists where a defamatory statement is made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or a duty, if it is made to a person with a corresponding interest or duty."). A teacher or principal must be able to speak freely to other school personnel about safety or educational concerns regarding a student. There is no evidence that Piilo or Smith made these comments maliciously or in bad faith.

James C. Mahan
U.S. District Judge

- 7 -

Racial discrimination claims brought pursuant to 42 U.S.C. § 2000d are evaluated using the burden-shifting scheme applied in Title VII cases. *See, e.g., Woods v. Wright Institute*, 141 F.3d 1183 (9th Cir. 1998)(*citing Larry P. by Lucille P. v. Riles*, 793 F.2d 969, 981-82 (9th Cir. 1984)). In order to prevail on this claim, plaintiffs are first required to allege the defendants intended to discriminate against Jacob based on race. *Woods*, 141 F.3d 1183 (*citing Johnson v. Transportation Agency*, 480 U.S. 616 (1987)). The burden then shifts to defendants to articulate a non-discriminatory rationale for their decision. *Id.* (*citing Village of Arlington Heights v. Metropolitan House. Dev. Corp.*, 429 U.S. 252 (1977)). In response, plaintiffs are required to present sufficient evidence demonstrating that the offered rationale is pretextual. *Id*.

Defendants have articulated the following justifications for their decision: (1) Jacob exhibits several self-injurious behaviors, referred to as "protest" behaviors, including banging his head on the floor and walls, biting himself, and trying to elope; (2) Piilo fractured her arm while trying to prevent Jacob from eloping; (3) Buenrostro fell and injured her back while trying to prevent Jacob from banging his head into the wall; (4) when Buenrostro fell she inadvertently hit another student; (5) Jacob had injured other students by kicking them, pulling their hair, and trying to bite them; (6) the classroom had to be evacuated when Jacob was engaging in protest behavior in order to ensure the safety of staff and the other children; (7) defendants felt another seating arrangement was necessary to limit elopement; and (8) CCSD consulted with an expert in the field of teaching children with autism, Ron Leaf, who recommended, *inter alia*, a separate work area for Jacob.

Based on these considerations, defendants assigned Spellman as Jacob's one-on-one aid and dedicated a separate area of the classroom for their use. The rationale behind defendants' decision is perfectly legitimate and non-discriminatory.

In response, plaintiffs rely on an insinuation made by the parent of another girl in Jacob's class, and then attempt to attribute that parent's views to the defendants as evidence of pretext. At some point, Jacob inappropriately pulled a bow from a classmate's hair and she became afraid of him. This incident prompted the girl's parent to contact the defendants and to relay his concerns regarding Jacob's inappropriate touching of his daughter. Principal Smith testified that, during her conversation

**James C. Mahan**
**U.S. District Judge**

- 8 -

1  with that parent, she began to suspect the parent was biased against African-Americans, despite the
2  parent never saying so outright. Smith also testified that her suspicion "disgusted" her and that she
3  relayed as much to the parent.
4        Plaintiffs' assertion that an unidentified parent of one of Jacob's classmates may or may not
5  harbor a racial bias towards African-Americans is irrelevant. There is no evidence that these
6  defendants ratified that parent's unconfirmed bias by relegating Jacob to a separate area of the
7  classroom because of his race.
8        Defendants have offered multiple legitimate, non-discriminatory reasons for their decision to
9  segregate Jacob. Those reasons are further corroborated by the very e-mails plaintiffs allege to be
10  defamatory. For their part, plaintiffs have failed to shoulder their burden in demonstrating those
11  reasons are pretextual. Accordingly, summary judgment is granted on this claim.
12        *3.    Invasion of privacy/false light*
13        Plaintiffs' invasion of privacy/false light claim is premised on the e-mails sent by Piilo and
14  Smith, and the subsequent disclosure of that information to classroom aide, Kayla Vucekovitch.
15        In order to prevail on this claim, plaintiffs must demonstrate: "(1) defendant[s] gave publicity
16  to a matter concerning [Jacob] that placed him before the public in a false light; (2) that the false light
17  would be highly offensive to a reasonable person; and (3) defendant[s] had knowledge of, or acted
18  in recklessly disregard as to, the falsity of the publicized matter and the false light in which [Jacob]
19  would be placed. False light also requires an implicit false statement of objective fact." *Barket v.*
20  *Clarke*, 2:12-cv-393-JCM-GWF, 2012 WL 2499359 (D. Nev. June 26, 2012) (*citing Vail v. Pioneer*
21  *Mut. Life Ins. Co.,* No. 2:10–cv–233–JCM (LRL), 2010 U.S. Dist. LEXIS 107994, at *5–6 (D.Nev.
22  Oct. 6, 2010)).
23        CCSD's regulations authorize information within a student's record to be shared with
24  employees and support staff that have a "legitimate educational interest" in that information. The
25  regulations explicitly include "student teachers" and "related service interns" among those who have
26  a legitimate educational interest in accessing a student's records. *See* NAC 388.289 (confidentiality
27  of records).
28

**James C. Mahan**
**U.S. District Judge**

1    Plaintiffs' argument that Vucekovitch was only "a lower level aide who changed diapers with
2 one semester of college" and therefore had no legitimate educational interest in the information is
3 unpersuasive.  The court does not find a meaningful distinction between a "classroom aide" and a
4 "related service intern" which would prohibit the disclosure of information regarding Jacob to
5 Vucekovitch.  As an aide working with Jacob in his classroom, Vucekovitch had a legitimate interest
6 in his information.
7    Accordingly, defendants cannot be held liable for disclosing Jacob's information to
8 Vucekovitch.  Summary judgment is granted.
9       *4.    Negligent infliction of emotional distress*
10    Alexandria and David Cherry assert a claim for negligent infliction of emotional distress
11 ("NIED") based on the alleged torts committed against Jacob.  Alexandria alleges her hair fell out and
12 she suffered from eczema.  David claims he lost the care and companionship of Alexandria and Jacob.
13    The court has already ruled that "to the extent that any damages sought by Alexandria and
14 David are actually for any distress from harm to Jacob, then those damages are improper." (*See* order
15 doc. # 88, p. 17, ln. 3-4).
16    Plaintiffs have confirmed in their opposition that their NIED claim is not alleged on Jacob's
17 behalf.  (*See* opposition doc. # 99, p. 23, ln. 21-22)("Here, that the direct victim of most acts was a
18 small, five to six year old nonverbal autistic child, cannot be denied *and this claim does not lie to*
19 *him*.")(emphasis added).  By confirming the claim relates to distress suffered by them from alleged
20 harm to Jacob, Alexandria and David have placed this claim squarely within the court's prior ruling
21 disallowing such.
22    Accordingly, summary judgment is granted in favor of defendants.
23       *5.    Negligent supervision*
24    To the extent this claim is related to Jacob's placement, IEP plan, communication system, and
25 other alleged deficiencies related to the accommodations provided for him, it goes to whether he was
26 provided with a FAPE.  To that end, the court has previously dismissed all claims seeking relief
27 available under the IDEA for failure to exhaust.  (*See* order doc. # 92).
28

**James C. Mahan**
**U.S. District Judge**

- 10 -

To the extent it relies on allegations regarding the supervision of Vucekovitch, defendants are entitled to immunity.

Relying on the Ninth Circuit and other courts in this district, this court has specifically held that Nevada's discretionary immunity statute, NRS 41.032(2), bars claims for negligent supervision. *See Beckwith v. Pool*, case no. 2:13-cv-125-JCM-NJK, 2013 WL 3049070, *5-6 (D. Nev. June 17, 2013).

Accordingly, summary judgment is granted.

## IV.   Conclusion

Because plaintiffs have failed to present a triable issue of fact as to any of the remaining claims, defendants' renewed motion is granted.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendants' renewed motion for summary judgment (doc. # 95) be, and the same hereby is, GRANTED. Defendants shall submit a proposed judgment within five (5) days from the issuance of this order.

DATED April 22, 2014.

_____
UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge

- 11 -